INMAN, Judge.
*401 Petitioner-Plaintiff Paul Frampton ("Frampton") appeals the trial court's order affirming the University of North Carolina at Chapel Hill's ("UNC's" or "the University's") final agency decision regarding his faculty grievance. On appeal, Frampton argues that UNC's unilateral decision in February 2012 to place him on leave without pay instead of following its own tenure policies and UNC's refusal to reinstate Frampton's pay once it initiated formal disciplinary proceedings in April 2013 were: (1) contrary to law; (2) unsupported by substantial evidence; and (3) arbitrary and capricious.
This case requires this Court, as it required the trial court and the University, to resolve an unusual and controversial dispute that tests the University's responsibilities as an employer of tenured faculty and *402 as a steward of public funds. After careful consideration and review of the record, we conclude that the University failed to properly apply its policies for the protection of tenured faculty.
We reverse the trial court's order and remand for further proceedings.
Factual and Procedural Background
The material facts from which this case arose are largely undisputed. Frampton was a nine-month tenured faculty member in the Department of Physics and Astronomy who had taught at UNC since January 1981. On 23 January 2012, Frampton was arrested at an airport in Argentina and charged with attempting to smuggle two kilograms of cocaine in his suitcase. Although Frampton *528 was assigned to teach a physics course at UNC at that time, he had traveled to Argentina without notifying UNC and without making arrangements for another professor to cover the class. Ultimately, on or around 20 November 2012, Frampton was convicted of smuggling cocaine and sentenced to four years and eight months imprisonment in Argentina. UNC learned of Frampton's arrest on 26 January, over two weeks after the first scheduled class meeting of PHYS 832, a reading course on general relativity that Frampton was expected to teach during the spring of 2012. Frampton has, at all times, maintained that he is an innocent victim of an Internet scam involving an alleged romantic involvement with an Italian swimsuit model.
Within a week after learning of Frampton's arrest, UNC found qualified counsel in Argentina willing to meet with Frampton,[1] and made two representatives from UNC available to meet with the judge and attorney handling Frampton's case. During this time, UNC maintained its hope, consistent with Frampton's assurances, that Frampton's legal troubles would be resolved quickly and that Frampton would be exonerated. In light of those expectations, UNC indicated its desire for Frampton to resume his employment with UNC upon his return.
On 17 February 2012, Executive Vice Chancellor and Provost Bruce Carney ("Provost Carney") wrote a letter to Frampton informing him that, due to Frampton's continued absence from his duties, and with no progress having been made toward his release, UNC would be requiring him to take personal leave without pay until such time as Frampton could "reassume [his] duties as a faculty member." Instead of pursuing disciplinary action through the "Trustee Policies and Regulations Governing *403 Academic Tenure" ("the tenure policies"),[2] UNC treated Frampton as if he were rendered unavailable, using by analogy UNC's Faculty Services Illness, Major Disability, and Parental Leave Policy ("the faculty leave policy"). The faculty leave policy states that, in cases of serious illness or major disability, a faculty member on nine months service "shall, upon his/her request, be granted up to sixty calendar days of paid leave in a fifty-two week period." An award of leave or denial of leave may be granted by the department chair and may be appealed to the provost, who makes the "final decision." Although Frampton received his full January and February pay and benefits, they were suspended on 1 March 2012. Thus, Frampton was paid for the first five weeks that he was imprisoned in Argentina.
The parties do not dispute that UNC could have initiated disciplinary proceedings against Frampton immediately upon learning of his arrest based on, among other reasons, failing to report for a scheduled class, traveling abroad without arranging to cover his job duties, and smuggling cocaine. These acts could fall within the scope of Section 603 of the Code of the University of North Carolina, which specifies permissible grounds for suspension (with or without pay), demotion, or discharge. The Code does not provide any presumption of innocence as a bar to action based upon alleged criminal behavior.
The tenure policies specify the procedural process for disciplinary actions regarding tenured faculty members. Initially, the provost notifies a faculty member in writing of the University's intention to suspend, demote, or terminate the faculty member. After providing such notice, the chancellor may reassign the faculty member or suspend him with full pay. Suspension without pay, which can be a form of discipline as the ultimate result of the disciplinary process, is not an option at this early stage.
A faculty member who disagrees with the provost's intended action can request a hearing before the faculty grievance hearing committee ("the Grievance Committee"), which then schedules a hearing. Following the hearing, the Grievance Committee makes a *529 written recommendation to the chancellor as to what action UNC should take. The recommendation is advisory and not binding. The chancellor then issues his or her decision regarding what disciplinary action, if any, will *404 be imposed on the faculty member. If the chancellor concurs in the Grievance Committee's recommendation that is favorable for the faculty member or otherwise reaches a decision favorable to the faculty member, his decision is final. However, if the chancellor declines to accept the Grievance Committee's favorable recommendation or concurs in a recommendation that is unfavorable, the faculty member may seek review of the decision by UNC's Board of Trustees.
The Board of Trustees' hearing on appeal from the chancellor's disciplinary decision is limited to determining whether the chancellor or the Grievance Committee "committed clear and material error in reaching the decision under review." Once the Board of Trustees makes its decision, the faculty member may appeal the decision to the Board of Governors of the entire North Carolina University system to determine whether the process or decision "had material procedural errors, was clearly erroneous, or was contrary to controlling law or policy."
I. UNC's Initial Decision to Place Frampton on Unpaid Personal Leave
In this case, after the provost notified Frampton that he would be placed on unpaid personal leave, Frampton filed a grievance challenging the decision to the Grievance Committee. The Grievance Committee heard Frampton's appeal on 6 September 2012. Frampton could not attend but participated by telephone.
Frampton argued that he was able to fulfill his professional duties even though he was in an Argentinian prison.[3] He further argued that the tenure policies prohibited UNC from placing him on personal leave and withholding his salary and benefits.
Following the hearing, the Grievance Committee issued a recommendation but did not decide the merits of Frampton's contentions regarding his ability to fulfill his duties, citing conflicting evidence. The Grievance Committee limited its review to whether UNC's decision to place Frampton on unpaid personal leave was made in accordance with *405 University policies and procedures. The Grievance Committee issued its recommendation to Chancellor Holden Thorp ("Chancellor Thorp") on or around 25 September 2012. The recommendation agreed with Frampton's argument that the faculty leave policy could only be used when a faculty member specifically requests it, noting that "[n]othing in the [faculty leave] policy appears to preclude an administrator from initiating the discussion, but [the Grievance Committee] do [es] not believe the policy supports an administrator imposing leave without the faculty member's assent." The Grievance Committee concluded that UNC had, essentially, placed Frampton on unpaid leave for failing to perform his duties, a situation controlled by the tenure policies, in violation of the process required by those policies. Consequently, the Grievance Committee recommended Chancellor Thorp "revisit th [e] decision" involving Frampton's employment status.
On 30 October 2012, after reviewing the Grievance Committee's recommendation, Chancellor Thorp wrote Frampton to inform him of his decision. Chancellor Thorp disagreed with the Grievance Committee's conclusion that UNC did not follow its policies. Chancellor Thorp acknowledged that the faculty leave policy did not specifically apply to Frampton's situation, but explained that the policy was used "by analogy" given that Frampton was "unavailable" to perform his duties. Therefore, "the fact that [Frampton] did not consent to being placed on leave does not establish a policy violation." Chancellor Thorp wrote that "personal leave" or "leave *530 without pay" is "an established mechanism" that "has been employed at the University in a number of cases where faculty members are absent for personal or other reasons and will not be performing University duties, but neither they nor the University want to terminate their University employment." Chancellor Thorp further noted:
[T]he Committee appears to have concluded that the University could respond to your incarceration and unavailability only by imposing disciplinary action or by doing nothing. I do not agree. Because your supervisors presumed that you were not guilty of the criminal charges against you until those charges had been proven in the Argentinian Courts, they reasonably concluded that it would be precipitous and unfair to take disciplinary action against you. That decision did not require the University to continue to pay you your salary under the circumstances presented. The University must be a good steward of public funds. We would violate the public's trust if we paid you *406 for work that you are not performing and I will not agree to do so.
Chancellor Thorp thus denied Frampton's grievance and left Frampton on unpaid leave "until such time as [Frampton] either return[ed] to work or [his] Chair and Dean request some modification of [his] employment status."
Meanwhile, on 20 November 2012, Frampton was found guilty of smuggling cocaine and sentenced to four years and eight months imprisonment in Argentina.
Frampton appealed Chancellor Thorp's decision to the Board of Trustees. Because Frampton's criminal conviction occurred after the chancellor's decision, it had no bearing on the Board of Trustees' review. On 28 March 2013, the Board of Trustees issued its decision. Because there was no "mandate [d] ... specific appeal procedure" for an appeal from unpaid personal leave, the Board applied the standard it would have used under the tenure policies and reviewed the decision to determine whether Chancellor Thorp committed "clear and material error." In its findings, the Board noted that "there is not currently a policy that outlines a tenured faculty member's employment status when he or she is incarcerated in another country." Furthermore, the Board found that the language of the faculty leave policy "did not appear to prohibit the University from providing the leave to the benefit of a faculty member." The Board concluded that "[g]iven these unique circumstances," it would unanimously uphold Chancellor Thorp's decision and deny Frampton's request for reinstatement of his salary.
II. UNC's Decision to Withhold Frampton's Salary Pending Disciplinary Action
On 23 April 2013, Provost Carney wrote Frampton to notify him that because of his criminal conviction for drug trafficking, "and the conduct that gave rise to that conviction," the University would begin formal disciplinary proceedings to terminate his employment. In his letter, Provost Carney reviewed evidence presented during Frampton's criminal trial, rejected Frampton's claims of innocence, and stated that Frampton's communications and conduct suggested that he knew or should have known that the suitcase he was carrying contained drugs or something of significant value that involved substantial risk. Carney noted that "[w]hile for many months [he] accepted [Frampton's] protestations of innocence, [Frampton's] conduct, as revealed by the evidence in the record and the circumstances of [his] arrest, trial, and conviction, has *407 convinced [Carney] that disciplinary action [was] warranted." The letter concluded that "your drug trafficking conviction and the conduct surrounding it have damaged the University's reputation and violated the public trust." Finally, the letter advised Frampton that he had 14 days to request a hearing before the Grievance Committee to appeal the termination and that " [t]he current terms of your employment remain in effect until further notice."
Frampton filed, within the 14-day deadline, a request for hearing before the Grievance Committee ("the second grievance"). On 17 May 2013, Provost Carney submitted the matter to the Grievance Committee. On *531 31 July 2013, Frampton filed with the Grievance Committee a written "Objection to the Validity of the Proceedings," contending that the University's refusal to reinstate his pay once these formal proceedings began was an egregious violation of the tenure policies and precluded further disciplinary proceedings until that violation was corrected.
On 2 August 2013, the Grievance Committee concluded that, because Frampton's appeal of the University's earlier decision to place him on personal leave without pay was still pending in superior court, it had "no jurisdiction to decide the issue of whether or not Professor Frampton's salary should have been suspended."
In a letter dated 27 August 2013, the Grievance Committee co-chairs wrote to Frampton's attorney further explaining its decision and noting that "[b]ecause the matters raised in [Frampton's second grievance] have already been adjudicated conclusively within the University, [they] do not believe that Professor Frampton can demonstrate that he has suffered a 'remedial injury,' as required by [the tenure policies]." It is unclear from the record whether, following the 27 August letter, Frampton appealed the Grievance Committee's decision to the Board of Trustees or whether Chancellor Thorp issued his own decision on the issue.
III. Superior Court Proceedings
On or around 3 September 2013,[4] Frampton amended his petition for judicial review to challenge UNC's denial of his claims for pay *408 and benefits in Orange County Superior Court.[5] In the amended petition, Frampton argued that UNC violated its own policies, exceeded its jurisdiction or authority, acted erroneously, and acted capriciously or arbitrarily not only when the University placed him on personal leave without pay in February 2012 but also when it initiated formal disciplinary proceedings in April 2013 without reinstating his pay.
The matter came on for hearing on 9 April 2014 before Judge R. Allen Baddour. At the hearing, Frampton argued that there is "no evidence that any faculty member has been treated in the way that [Frampton] was ever treated." In response, UNC provided a list of tenured faculty members who had been placed on personal leave without pay, including an assistant professor who took unpaid personal leave to address an issue with his immigration status. However, Frampton argued that UNC's evidence failed to indicate whether the faculty members listed had actually requested personal leave or consented to it. Without this evidence, Frampton contended that there was no way of knowing whether UNC had ever before placed a faculty member on personal leave involuntarily;
*532 thus, there was no precedent for the University's decision.
In contrast, UNC argued that Frampton's incarceration abroad was a "novel situation" and that it did not want to initiate suspension or termination proceedings initially because it believed Frampton's claims of innocence. Instead, UNC alleged that it looked to the faculty leave policy "for guidance" and continued to pay Frampton until 1 March, five weeks after Frampton was detained. As a result of the nondisciplinary personal leave, Frampton remained free to resume his employment once *409 his legal situation in Argentina was resolved, with no disciplinary action pending. UNC further disagreed that the faculty leave policy requires the consent of the faculty member; instead, UNC characterized unpaid personal leave as, quoting Chancellor Thorp, an "established mechanism" to address Frampton's situation even though it was "unprecedented" in that Frampton failed to request leave even though he knew that he would be unable to perform his duties while imprisoned in Argentina.
With regard to the refusal to reinstate Frampton's pay once formal termination proceedings began, Frampton argued that once the University invoked the tenure policies, those policies clearly required that he be suspended with full pay while those proceedings went forward. UNC represented to the trial court that it was proceeding with "other administrative proceedings." The status of the administrative proceedings on the second grievance at the time of the hearing is unclear from the record.[6]
On 9 May 2014, the trial court issued its order affirming UNC's decision to place Frampton on unpaid leave and affirming UNC's refusal to reinstate Frampton's pay pending disciplinary proceedings.
Frampton timely appeals.
Standard of Review
"Where there is an appeal to this Court from a trial court's order affirming an agency's final decision, we must determine (1) the appropriate standard of review and, when applicable, (2) whether the trial court properly applied this standard." Krueger v. N.C. Criminal Justice Educ. & Training Standards Comm'n, 198 N.C.App. 569, 575, 680 S.E.2d 216, 220 (2009) (internal quotation marks omitted). The trial court's review of a final agency decision is governed by N.C. Gen.Stat. § 150B-51(b) (2013):
The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
*410 (1) In violation of constitutional provisions;
(2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
(6) Arbitrary, capricious, or an abuse of discretion.
Review of an agency's final decision is based on the nature of the issues on appeal. Nanny's Korner Care Ctr. v. N.C. Dep't of Health & Human Servs., --- N.C.App. ----, ----, 758 S.E.2d 423, 427 (2014). The trial court's review of alleged errors listed in subsections (1) through (4) are examined under a de novo standard of review. N.C. Gen.Stat. § 150B-51(c). "Under the de novo standard of review, the trial court considers the matter anew and freely substitutes its own judgment for the agency's."
*533 Equity Solutions of the Carolinas, Inc. v. N.C. Dep't of State Treasurer, ---N.C.App. ----, ----, 754 S.E.2d 243, 248 (2014) (internal quotation marks omitted). Alleged errors listed in subsections (5) and (6) are reviewed using the whole record standard of review. N.C. Gen.Stat. § 150B-51(c). When applying the whole record test, "the trial court must examine all the record evidence in order to determine whether there is substantial evidence to support the agency's decision." Equity Solutions, --- N.C.App. at ----, 754 S.E.2d at 248. However, the trial court "may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter de novo. " Id.
Analysis
Frampton argues first that, by placing him on unpaid personal leave instead of initiating proceedings under the tenure policies, UNC violated its own rules and procedures because: (1) the faculty leave policy is available to the University only at the request of, or with the consent of, the faculty member; (2) there was no precedent for UNC's action; and (3) the tenure policies provide a clear and controlling procedure to address the circumstances of Frampton's situation. Because Frampton's situation fell within the scope of the tenure policies and because the plain language of the faculty leave policy prohibits UNC from unilaterally placing a faculty member on unpaid personal leave, we agree.
*411 As noted above, our review of this argument is whether, under a de novo review, the trial court erred in affirming the Board of Trustees' final agency decision upholding the placement of Frampton on unpaid leave prior to the initiation of disciplinary proceedings.
Generally, an agency's interpretation of its own policies is accorded some deference unless that interpretation is clearly inconsistent with the plain language of the policies. Pamlico Marine Co. v. N.C. Dep't of Natural Res., 80 N.C.App. 201, 206, 341 S.E.2d 108, 112 (1986) ; Morrell v. Flaherty, 338 N.C. 230, 237-38, 449 S.E.2d 175, 180 (1994). This includes any policies or regulations addressing faculty members' employment. See Simonel v. N.C. Sch. of Arts, 119 N.C.App. 772, 775, 460 S.E.2d 194, 196 (1995). However,
If the only authority for the agency's interpretation of the law is the decision in that case, that interpretation may be viewed skeptically on judicial review. If the agency can show that the agency has consistently applied that interpretation of the law, if the agency's interpretation of the law is not simply a "because I said so" response to the contested case, then the agency's interpretation should be accorded the same deference to which the agency's construction of the law was entitled under prior law.
Rainey v. N.C. Dep't of Pub. Instruction, 361 N.C. 679, 681-82, 652 S.E.2d 251, 252-53 (2007) (quoting Brad Miller, What Were We Thinking?: Legislative Intent and the 2000 Amendments to the North Carolina APA, 79 N.C. L. Rev. 1657, 1665-66 (2001) ).
N.C. Gen.Stat. § 116-11(2) (2013) authorizes the Board of Governors to adopt policies and regulations for "all affairs," including faculty employment. Beginning in 1976, the Board of Governors adopted extensive policies governing academic tenure procedures and, later, policies affording tenured faculty members leave for various personal reasons not covered by FMLA or other tenure policies since tenured faculty do not accrue vacation or sick time. Under the tenure policies, which were last amended in 2009, UNC could have initiated disciplinary proceedings against Frampton for misconduct, including alleged criminal conduct, incompetence, and neglect of duty immediately upon learning that he was incarcerated in Argentina.
UNC asserts that "it would have been premature to make a decision about disciplinary action" when it first learned of Frampton's arrest and that "no specific rule or policy clearly addressed [Frampton's] situation." Our de novo review of the tenure policies leads us to a contrary *412 conclusion. Section 3(a) of the tenure policies provides that disciplinary action, including suspension, can be initiated based on a faculty member's "neglect of duty, including, but not limited to, *534 sustained failure to meet assigned classes or to perform other significant faculty professional obligations." While we agree with UNC that Frampton's situation where he was arrested in another country for alleged criminal behavior was certainly novel and unique, it does not fall outside the scope of the tenure policies. The tenure policies contemplate situations in which UNC would be authorized to begin disciplinary proceedings for someone who has been accused of criminal behavior and is unable to, for whatever reason, fulfill his professional duties including teaching and advising. Here, setting aside the bizarre circumstances surrounding Frampton's arrest, UNC was faced with a professor whom administrators believed could not, among other things, teach, advise students, or participate in his administrative obligations with any consistency. Frampton's initial contention that he could still fulfill all of his professional duties did not preclude UNC from taking disciplinary action, but merely would have set into action the grievance procedure provided for in the tenure policies. Therefore, the tenure policies clearly provided for resolution of Frampton's situation.
We do not find support in the record for UNC's position that its decision to impose unpaid personal leave in lieu of disciplinary action under the tenure policies was a "prior practice" that UNC has used in other employment situations. While the record does include evidence showing that other professors had been placed on unpaid personal leave, nothing in the record establishes that unpaid leave had ever before been imposed on a non-requesting, non-consenting faculty member.[7] Thus, we view UNC's actions with less deference than we might have had UNC produced evidence that this was a standard practice. See Rainey, 361 N.C. at 681-82, 652 S.E.2d at 252-53.
Moreover, we do not believe that UNC's application of the unpaid personal leave policy, even if it was only applied "by analogy," was proper. The faculty leave policy states that a faculty member on nine months service "shall, upon his/her request, be granted up to sixty calendar days of paid leave in a fifty-two week period" for serious illness *413 or majority disability. Frampton argues that the language "upon his/her request" indicates that this type of leave is only available for faculty members who request it. We agree based on this language as well as the structure of the unpaid leave policy. The phrase "upon his/her request" indicates that the faculty member's request of or consent to being placed on paid or unpaid leave is a mandatory condition precedent to the application of this type of leave. While we can envision scenarios in which it would be more beneficial to place a tenured faculty member on unpaid personal leave without his or her consent in order to protect the faculty member's reputation from the stigma associated with disciplinary actions-even if those proceedings result in a favorable outcome-we believe that the more reasoned interpretation of the unpaid leave policy could only support its application if the faculty member either requested it or consented to it. Moreover, the fact that there is no "mandated" appeal procedure for this type of leave suggests that, unlike the disciplinary proceedings which are imposed without consent, the unpaid personal leave policy is not intended to be unilaterally imposed upon a tenured professor given the procedural protections afforded to faculty members in all other situations.
Our interpretation of the unpaid leave policy does not preclude a tenured professor, confronted with alleged grounds for disciplinary action, to request unpaid leave in hopes of resolving problems and avoiding harsher consequences. Rather, it should be the choice of the tenured professor, and not UNC, as to whether the professor continues to be the subject of disciplinary proceedings or takes unpaid personal leave. In this case, the tenure policies required that Frampton *535 be allowed this choice. If Frampton had chosen to oppose disciplinary action rather than request or consent to unpaid leave, his grievance hearing could have proceeded prior to his criminal trial, and his employment might have terminated prior to his criminal trial.
In seeking to persuade us that its decision to not initiate disciplinary proceedings was not a violation of policies, UNC contends that it only did so in an effort to "assist" Frampton to give him time to "exonerate himself" without suffering any professional harm. The record indeed supports UNC's contention that its administrators initially believed that Frampton was innocent and hoped that his legal situation would be resolved in short order. However, we cannot, in our de novo review, affirm the trial court's ruling based on UNC's concern for Frampton's well-being nor based on UNC's own determination of what was in his best interest. Instead, we must decide based on the clear and unambiguous language of its policies.
*414 Here, the tenure policies provided recourse for UNC even in Frampton's unusual situation. The language of the unpaid personal leave does not support its application when it is not requested or consented to by the tenured faculty member. Even if that application was "by analogy," UNC violated its own policies when it first failed to initiate disciplinary proceedings but, instead, unilaterally placed Frampton on unpaid personal leave. Therefore, we must reverse the trial court's order upholding UNC's decision and hold that Frampton was entitled to be paid from the date he was placed on leave until the date his employment terminated.[8]
We cannot determine from the record when Frampton's employment was terminated. Therefore, we must remand this matter to the trial court to make that finding, as that date is essential to determining the time period during which Frampton was entitled to be paid. In his appellate brief, Frampton asks this Court to take judicial notice that he submitted his resignation/retirement for medical reasons on 21 April 2014. We cannot verify the date from the record on appeal. On remand, the trial court may verify this date from the administrative record of events which occurred after this appeal was taken and may, if deemed appropriate, take judicial notice of the date of Frampton's resignation or make any other finding regarding the termination date. In addition to finding when Frampton's employment was terminated, the trial court should make findings necessary to calculate a monetary damage amount based on the pay and benefits due to Frampton during the period between 1 March 2012, the date UNC stopped paying his salary and benefits, and the date Frampton's employment was terminated.
Conclusion
Based on the foregoing reasons, we conclude that UNC violated its own policies when it placed Frampton on unpaid personal leave instead of initiating formal disciplinary proceedings in accordance with the tenure policies. Therefore, we must reverse the trial court's order and remand for the trial court to determine the date on which Frampton's employment was terminated and to determine the amount of salary and benefits which were withheld and should be paid to Frampton. Based *415 on this conclusion, it is not necessary to address Frampton's remaining arguments on appeal.
REVERSED AND REMANDED.
Judges ELMORE and GEER concur.

Frampton declined to retain the attorney identified by UNC, instead choosing to be represented by public defenders.

The tenure policies were adopted by UNC's Board of Trustees and approved by the Board of Governors in 1976 and have been amended several times. The policies contained in the record were last amended in 2009. The specific policies at issue in this lawsuit are in Section 3.

Frampton claimed that he had published six refereed papers in 2012 and had written two or three papers while in Devoto prison in Argentina and that his "rate of productivity is consistent with his rate before imprisonment." Frampton also alleged that he had continued to advise two Ph.D students with phone meetings at least once a week and, often, twice a week. Moreover, Frampton contended that he could have taught the physics class on general relativity as a reading class over the phone and that he could have participated in all necessary administrative hearings including faculty and committee meetings by speakerphone.

A copy of the amended petition for judicial review included in the record on appeal was file-stamped on 15 April 2014, after the trial court's hearing. However, at the hearing, Frampton's counsel contended that it had been filed with the trial court a few days after service on UNC, and UNC conceded that it had received a copy of the amended petition on 3 September 2013. In fact, UNC responded to the amended petition for review on 3 October 2013. UNC does not challenge the validity of Frampton's contention that the amended petition was properly filed before the hearing nor does it advance any argument on appeal that Frampton's failure to include a copy of the amended petition showing a file-stamp date in September 2013 prevents him from raising the arguments contained in that amended petition on appeal. Accordingly, we will not address any potential procedural insufficiencies of the amended petition and will, for purposes of this opinion, treat the amended petition as if it were properly filed in September 2013, before the trial court's hearing. See generally, Abbott v. N.C. Bd. of Nursing, 177 N.C.App. 45, 48, 627 S.E.2d 482, 484 (2006) ( "It is not the role of the appellate courts to create an appeal for an appellant.").

In his amended petition, in addition to his claim for judicial review of the University's final agency decision, Frampton also asserted claims for declaratory judgment, breach of contract, and writ of mandamus. However, the trial court granted UNC's motion to dismiss these claims pursuant to Rules 12(b)(1), (2), and (6). Frampton did not appeal the trial court's order granting UNC's motion to dismiss. Therefore, Frampton has waived appellate review of those claims, and we do not address any arguments on those issues; only Frampton's claim for judicial review of UNC's actions is properly before us. See Wilkerson v. Duke Univ., ---N.C.App. ----, ----, 748 S.E.2d 154, 161 (2013) (concluding that, under Rule 28(b)(6), the plaintiff's failure to include any argument challenging the trial court's order granting summary judgment in favor of the defendants on the plaintiff's claims for public stigmatization and negligence waives those issues on appeal).

Although Frampton initially argued that he could still fulfill all of his professional duties, he does not contend on appeal that his subsequent termination was not supported by adequate grounds nor did he put forth any argument in his amended petition that UNC did not have grounds to terminate his employment once it initiated the disciplinary proceedings. Thus, the issue of whether the University had proper grounds to terminate him is not within the scope of his appeal. However, as explained below, it will be necessary for the trial court to determine the date Frampton's employment was terminated because that date defines the duration of Frampton's unpaid leave.

At the hearing, UNC provided a redacted list of professors who had taken unpaid personal leave for non-medical reasons. However, the list failed to indicate whether any of those professors had-or had not-requested or consented to the leave. Without that information, the list provides no support for UNC's claim that placing professors on unpaid personal leave in lieu of disciplinary proceedings was an "established mechanism" that could also apply in Frampton's case.

In so holding, it is not necessary to address Frampton's argument that UNC's decision to place him on unpaid personal leave was arbitrary and capricious nor do we need to examine the issue of whether UNC should have reinstated his pay and benefits once it formally initiated disciplinary proceedings in April 2013.