DAVIS, Judge.
 

 *431
 
 In this case, a State agency dismissed a career status employee following a pattern of insubordinate and inappropriate conduct on the part of the employee that occurred over a period of years. The employee challenged his discharge in the North Carolina Office of Administrative Hearings, and an administrative law judge upheld the dismissal. Because we conclude that his discharge did not violate North Carolina law, we affirm.
 

 Factual and Procedural Background
 

 Daniel Smith was employed by the North Carolina Department of Public Instruction ("DPI") as a section chief in the Student Certification and Credentialing Section beginning on 18 January 2011. Throughout the time period relevant to this litigation, Smith was supervised by Jo Honeycutt, the director of DPI's Career and Technical Education ("CTE") Division. One of Honeycutt's duties as Smith's supervisor was to complete annual evaluations of his performance as an employee.
 

 For the 1 July 2013 through 30 June 2014 review period, although Honeycutt gave Smith an overall rating of "Very Good" on his evaluation, she rated his performance on the "Client Focus" standard as "Below Acceptable." Honeycutt further noted on the evaluation that Smith needed to place "additional focus" on "improved communication with stakeholders and respect for others in the agency."
 

 During that time period, Smith sent multiple inflammatory emails to employees of DPI partner organizations. In June 2013, Smith emailed a representative of the Association for Career and Technical Education ("ACTE") to inquire when an article Smith had submitted would be published in ACTE's trade publication. After the ACTE representative informed Smith that his article might not be published until the following year and asked him whether this was acceptable, Smith responded, "NO, I'm not good at all with the information nor your tone." In the same email, Smith wrote the following: "I'm not going away! Print the truth about credentialing or I'll take it down the street .... Threat, no. Promise, yes."
 

 In November 2013, a vice-president of the National Institute for Automotive Service Excellence circulated information in an email that Smith read regarding a meeting about automotive programs and credentialing that was to take place at an upcoming ACTE conference. Smith replied to the email as follows: "Not a single member of the NC CTE staff will be attending this conference headed by corrupt persons out to enrich themseleves [sic] at the expense of our children!"
 

 *564
 
 He copied two DPI employees from his section on this email.
 

 *432
 
 In July of 2014, Smith wore a tank top and shorts to a social event that took place during a professional conference. Honeycutt met with Smith after the conference to discuss DPI's expectations regarding appropriate attire for its employees both in the workplace and at work-related events. The following month, Smith expressed his opinion to Claire Miller, DPI's Assistant Human Resources Director, that DPI's dress code was discriminatory against men in that women were permitted to wear open-toed shoes while men were not. In response to Smith's concerns, DPI's existing dress code guidelines were withdrawn on 4 September 2014 while DPI leadership considered whether to issue new guidelines.
 

 On 22 September 2014, Smith was scheduled to be a presenter during morning and afternoon sessions of a conference hosted by DPI at Wrightsville Beach. Although Smith was prepared to present at the beginning of the morning session, he left the conference after a few minutes because no conference attendees had yet come to his session. Because he failed to return to the conference that day, Smith did not give his scheduled presentation during the afternoon session even though conference attendees were, in fact, present at that session.
 

 In October 2014, DPI staff learned from employees at the North Carolina Department of Labor ("DOL") that Smith had provided a reference to DOL staff for a former DPI employee whom he did not supervise during that individual's employment at DPI. Upon investigating the matter, Honeycutt determined that Smith had "misled another state supervisor" through his actions and issued him a written warning for misconduct.
 

 Smith filed a complaint against DPI with the Equal Employment Opportunity Commission ("EEOC") on 30 September 2015. In his complaint, he alleged that DPI had retaliated against him for voicing his concerns about its dress code guidelines by, among other things, falsely accusing him of not attending the September 2014 Wrightsville Beach conference, giving him a written warning for misconduct, and moving his work cubicle to a new location.
 
 [1]
 
 Thereafter, Smith openly discussed with colleagues at DPI the fact that he had filed an EEOC complaint.
 

 Revised dress code guidelines were made available to DPI employees on 9 October 2015. Smith subsequently printed the new guidelines on colorful paper and posted them in several places throughout his division. Upon discovering that the guidelines he posted had been taken
 
 *433
 
 down and thrown away, Smith retrieved them from the trash can and hung them up again.
 

 On 8 December 2015, Smith became involved in an argument with Carol Short, a female colleague at DPI, about an "Ugly Christmas Sweater" contest that was scheduled to take place at DPI's upcoming holiday party. During the exchange, which was overheard by several colleagues, Smith spoke in a loud and argumentative voice while making disparaging remarks about the contest and calling it discriminatory against men. He cited the contest as another example of how women "made all the decisions" at DPI.
 

 Short was very upset by this exchange and reported to DPI Human Resources staff her concerns about the 8 December incident and her belief that Smith's behavior created a hostile work environment for female employees. From January to April 2016, a DPI review team (the "Review Team") comprised of Human Resources personnel and internal audit staff conducted an investigation into Short's allegations against Smith. As part of its investigation, the Review Team interviewed approximately 21 DPI employees, including Smith. During his interview with the Review Team, Smith repeatedly responded to questions about the 8 December 2015 incident by giving answers such as "I do not wish to discuss [it] with you at this time" and "I don't care to share."
 

 On 1 February 2016, Christy Cheek, the CTE director for the Buncombe County Schools System, forwarded an email to Honeycutt that Cheek had received from an individual named Sharon Verdu. In her email, Verdu stated that she had applied for
 
 *565
 
 a health science consultant position with DPI in September 2015 and that Smith behaved unprofessionally toward her during the interview process. Specifically, Smith told Verdu that he and Honeycutt "did not get along well and that [Honeycutt] discriminated against him because he was male." Smith further informed Verdu that he might be filing a lawsuit for discrimination against DPI. In her email, Verdu wrote that she believed Smith was attempting to encourage her to remove her name from consideration for the position given his statement to her that "the first candidate hit it out of the ballpark in her interview" and the fact that Smith gave Verdu his personal cell phone number so that she could call and inform him if she decided to withdraw her application. Ultimately, Verdu did, in fact, withdraw her application from consideration for the health science consultant position.
 

 On 29 March 2016, Honeycutt received an email from Trina Williams, the CTE coordinator for the Hickory Public Schools System, regarding
 
 *434
 
 two postings that Smith had "liked" on his LinkedIn account. The first post was by an author of "erotic and paranormal romance." The caption for the post read, "Let's Talk Sex ..." and the post contained a picture of a woman's breasts in a bra. The second post contained a picture of multiple scantily clad women.
 

 Upon concluding its investigation into Short's allegations against Smith, the Review Team submitted a report to DPI's director of Human Resources on 11 May 2016. In its report, the Review Team found that Smith's behavior toward Short on 8 December 2015 was "intimidating to her" and that Smith "frequently engaged in a pattern of unwelcome behavior toward women, including ... humiliating treatment of women in public professional settings. This behavior is especially egregious from a person in a leadership position." The report further stated that Smith's conduct in the workplace "had a detrimental impact on CTE staff and performance and disrupted the work of the division, even negatively impacting the brand of the division with its clients." The Review Team recommended that DPI leadership take "appropriate action" with regard to Smith.
 

 On 18 May 2016, Smith received a pre-disciplinary conference notification letter from Honeycutt. Smith, Miller, and Honeycutt were present at the conference, which was held later that same day. During the conference, Smith was given an opportunity to respond to the issues set out in the notice, which included his (1) confrontation with Short; (2) accusations that DPI was discriminatory toward men and conduct in posting the revised dress code guidelines; (3) handling of Verdu's interview for the health science consultant position; and (4) LinkedIn account activity. Smith told Honeycutt and Miller that he believed his actions in posting the dress code guidelines were "beneficial to CTE staff" and denied the allegations concerning Verdu's interview with him. He further stated that he thought it was appropriate for him to "like" the first LinkedIn post because "as an educator [he] valued authors even if the author wrote about erotic, paranormal activity."
 

 By means of a letter dated 19 May 2016 (the "Dismissal Letter"), Honeycutt notified Smith that his employment with DPI was being terminated. After discussing the fact that Smith had repeatedly and publicly "criticized [Honeycutt] and DPI leadership" and engaged in disrespectful and insubordinate behavior on multiple occasions, the letter listed the specific grounds forming the basis for his dismissal as follows:
 

 1.
 
 Showing disrespect to co-worker(s) or authorized supervisor that harms the cohesiveness in the
 

 *435
 

 organization or hinders the organization in carrying out effectively its tasks, goals, and mission according to [DPI] Human Resources Division Discipline Policy and Procedure, section 2
 
 [.]
 

 a. On December 8, 201[5], you were disrespectful to Ms. Carol Short in the interchange you had with her in Dr. David Barbour's cubicle, by raising your voice, talking over her, and pointing your finger in her face and the effect of your behavior harmed the cohesiveness in our division.
 

 b. As cited above, I recently learned that you have made critical statements about me to several others in
 
 *566
 
 our division most especially since the Fall of 2015 and that the pattern of your open and public criticism of me has harmed the cohesiveness of CTE.
 

 c. In recent months, you have openly and with several CTE staff, noted that you have a "lawsuit" against [DPI] because [DPI] is discriminatory toward men. The statements you have made, your behavior such as posting the dress guidelines repeatedly has harmed the cohesiveness in CTE, and is unbecoming conduct of a CTE leader.
 

 2.
 
 Conduct unbecoming of a State employee that is detrimental to State service according to [DPI] Human Resources Division Discipline Policy and Procedure, section 2.
 

 a. As cited above, how you handled the search for the Health Consultant was in contradiction to Human Resources policy and unbecoming conduct of a state leader.
 

 b. Posting or "liking" the 2 items on [your] Linkedin [sic] account as noted above when you were connected to other CTE professionals, is inconsistent with [DPI]'s mission and harms the reputation of you, CTE, and [DPI]. This is considered conduct unbecoming and is detrimental to state service.
 

 *436
 
 On 6 June 2016, Smith filed an internal grievance with DPI that challenged his discharge. Following a hearing, he was notified by letter dated 1 September 2016 of DPI's decision to uphold his dismissal. Smith filed a petition for a contested case hearing in the North Carolina Office of Administrative Hearings ("OAH") on 27 September 2016 in which he argued that DPI had dismissed him without just cause in violation of the North Carolina Human Resources Act.
 
 See
 

 N.C. Gen. Stat. § 126-1
 

 et seq.
 
 (2017).
 

 A hearing was held in OAH that took place on 13 January 2017, 4 May 2017, 12 May 2017, and 13 May 2017 before Administrative Law Judge ("ALJ") Donald W. Overby. On 21 August 2017, the ALJ issued a Final Decision containing the following pertinent findings of fact:
 

 40. On or about December 8, 2015, [Smith] was involved in a verbal exchange with a female colleague and fellow DPI Section Chief, Ms. Carol Short. During this verbal exchange, [Smith] became upset and raised his voice while expressing his dissatisfaction to Ms. Short about the "Ugly Christmas Sweater" contest which was planned as part of the Division's upcoming annual holiday party.
 

 41. [Smith] was visibly and audibly upset during the exchange with Ms. Short, and was overheard by several colleagues speaking in a loud and argumentative voice to her. During the exchange with Ms. Short, [Smith] made disparaging remarks about the contest, calling it discriminatory against men, and cited it as another example of how women at DPI made all the decisions. [Smith] also incorrectly accused Ms. Short of being responsible for IT courses being moved from his section to hers.
 

 42. Ms. Short was very upset by the exchange with [Smith] and discussed it with her supervisor, Ms. Honeycutt. In turn, Ms. Honeycutt suggested to Ms. Short that she discuss her concerns with HR staff.
 

 43. Ms. Short reported her concerns about [Smith] to HR staff on December 15, 2015, and again on January 28, 2016. Ms. Short alleged that she was unlawfully harassed by [Smith] due to her gender, and that [Smith] had created a hostile work environment for her and other women at DPI. In addition, Ms. Short reported that [Smith]: (a) had asked her whether she "ratted" on him to the CTE Division Director; (b) openly and publicly criticized the
 
 *437
 
 CTE Division Director; (c) discussed his performance and a disciplinary action he received; and (d) shared that he had a "lawsuit" against DPI. Ms. Short indicated that she believed these actions had a detrimental effect on the Division work force and were disruptive to the work environment.
 

 ....
 

 *567
 
 53. On February 1, 2016, Ms. Christy Cheek, the CTE Director with the Buncombe County Schools System, forwarded to Ms. Honeycutt an email sent to her (Ms. Cheek) from Ms. Sharon Verdu. Ms. Verdu stated in her email that she had applied for a Health Science consultant position at DPI in September 2015, and that as part of the interview process with [Smith], he had acted unprofessionally towards her. Among other things, Ms. Verdu stated that [Smith] told her that he and Ms. Honeycutt did not get along well and that Ms. Honeycutt discriminated against him because he was male. Ms. Verdu also stated that [Smith] told her that he might be filing a lawsuit for discrimination against DPI. Ms. Verdu stated that she felt as though [Smith] was trying to discourage her from staying in as a candidate for the Health Science consultant position because [Smith] had told her after her interview that, "the first candidate hit it out of the ballpark in her interview." Then he gave her his personal cell phone number so she could call him and let him know if she was going to withdraw her application. Ultimately, Ms. Verdu withdrew her application for the position from consideration.
 

 54. At the hearing in this matter, Ms. Verdu maintained that, during the interview process, [Smith] criticized Ms. Honeycutt and the work environment within the CTE Division. He also indicated to her that he might be leaving DPI for another job and discouraged her from staying in the running for the position for which she had applied. Ms. Verdu explained why she had delayed in coming forward to report how [Smith] had acted inappropriately and unprofessionally toward her as part of the interview process. Ms. Verdu also explained that [Smith]'s conduct had a negative impact on her perception of DPI and influenced her decision, in part, about whether to stay in the application process.
 

 *438
 
 ....
 

 59. On March 29, 2016, Ms. Honeycutt received email correspondence about [Smith] from the CTE Coordinator with the Hickory Public Schools System, Ms. Trina Williams. In the emails from Ms. Williams, she included two photos/images that were posted to [Smith]'s LinkedIn account. Both images were of women, some in scanty dress and one of a woman's breasts in a bra. The caption for one of the posts read, "Let's talk sex ..." Upon receiving the emails from Ms. Williams, Ms. Honeycutt sent them to Ms. Miller and expressed her concern to Ms. Miller that the posting of the images by [Smith] on his LinkedIn account demonstrated "unprofessional conduct or at least poor judgment when the profile has the employer name."
 

 Based upon his findings of fact, the ALJ made the following pertinent conclusions of law:
 

 14. Based on the preponderance of the evidence, [DPI] met its burden of proof that it had "just cause" to dismiss [Smith] for unacceptable personal conduct.
 

 15. [Smith]'s conduct of engaging in a heated discussion with Carol Short on December 8, 2015 was unacceptable personal conduct justifying dismissal. During that conversation, he raised his voice at her, talked over her, argued with her about the Division's holiday sweater contest being discriminatory against men, accused her of stealing IT courses away from his Section, and became visibly and audibly angry.
 

 16. As a Section Chief in the CTE Division, [Smith]'s conduct of openly and repeatedly making critical statements about the CTE Division Director to others in the Division, including complaining that the Division Director is an unfair and critical supervisor who targeted [Smith] for unfair treatment, was unacceptable personal conduct justifying dismissal.
 

 17. As a Section Chief in the CTE Division, [Smith]'s conduct of openly sharing with others within the Division that he had a lawsuit or action against DPI based on the agency's alleged discriminatory dress code, and posting and re-posting the dress code guidelines throughout the Division, was unacceptable personal conduct justifying dismissal.
 

 *439
 
 18. As a Section Chief in the CTE Division, [Smith]'s conduct of making inappropriate comments to a prospective employee of DPI, including derogatory comments about
 
 *568
 
 DPI's CTE Division Director, and comments discouraging the candidate from continuing in the application and hiring process, was unacceptable personal conduct justifying dismissal.
 

 19. As a Section Chief in the CTE Division, [Smith]'s conduct of posting or "liking" risqué images on his LinkedIn account was unacceptable personal conduct justifying disciplinary action.
 

 20. To the degree that evidence has been admitted in this contested case hearing which is not articulated with particularity in the four-corners of the dismissal letter, that evidence is admitted in keeping with
 
 Heard-Leak v. N.C. State Univ. Ctr. for Urban Affairs
 
 , --- N.C. App. ----, ----,
 
 798 S.E.2d 394
 
 , 398 (2016) [.]
 

 ....
 

 22. These multiple incidents of misconduct, which had a detrimental effect on the cohesiveness of the Division and the workplace environment, when viewed in their totality, and in light of [Smith]'s failure to respond positively to multiple past attempts by [DPI] to provide feedback and effectuate change in [Smith]'s workplace behavior, constitute unacceptable personal conduct justifying dismissal. [DPI] has met its burden to show that it had "just cause" to dismiss [Smith].
 

 Smith filed a timely notice of appeal to this Court pursuant to N.C. Gen. Stat. §§ 7A-29(a) and 126-34.02(a).
 

 Analysis
 

 Before we address the specific arguments made by Smith in this appeal, it is appropriate to review both the substantive provisions of law that govern the ability of State agencies to discipline career employees and the statutory framework applicable to appeals of such personnel decisions.
 

 The North Carolina Human Resources Act provides that "[n]o career State employee ... shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause."
 
 N.C. Gen. Stat. § 126-35
 
 (a) (2017).
 

 *440
 
 Our Supreme Court has explained that "[j]ust cause is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case."
 
 Wetherington v. N.C. Dep't of Pub. Safety
 
 ,
 
 368 N.C. 583
 
 , 591,
 
 780 S.E.2d 543
 
 , 547 (2015) (citation and quotation marks omitted).
 

 "There are two bases for the ... dismissal of employees under the statutory standard for 'just cause' as set out in G.S. 126-35." 25 N.C. Admin. Code 1J.0604(b) (2018). First, a career State employee may be dismissed based on "unsatisfactory job performance."
 
 N.C. Dep't of Env't & Natural Res. v. Carroll
 
 ,
 
 358 N.C. 649
 
 , 666,
 
 599 S.E.2d 888
 
 , 899 (2004). Second, an employee may be dismissed based on "unacceptable personal conduct."
 

 Id.
 

 This Court [has] delineated the difference between unacceptable job performance and unacceptable personal conduct and held that termination for engaging in the latter category is appropriate for those actions for which no reasonable person could, or should, expect to receive prior warnings. The State Personnel Manual lists, "careless errors, poor quality work, untimeliness, failure to follow instructions or procedures, or a pattern of regular absences or tardiness" as examples of unsatisfactory job performance. Unacceptable personal conduct includes "insubordination, reporting to work under the influence of drugs or alcohol, and stealing or misusing State property."
 

 Leeks v. Cumberland Cty. Mental Health Developmental Disab. & Sub. Abuse Facil.
 
 ,
 
 154 N.C. App. 71
 
 , 76-77,
 
 571 S.E.2d 684
 
 , 688-89 (2002) (internal citations, quotation marks, brackets, and emphasis omitted).
 

 The North Carolina Administrative Code defines "unacceptable personal conduct" as:
 

 (a) conduct for which no reasonable person should expect to receive prior warning;
 

 (b) job-related conduct which constitutes a violation of state or federal law;
 

 (c) conviction of a felony or an offense involving moral turpitude that is detrimental to or impacts the employee's service to the State;
 

 (d) the willful violation of known or written work rules;
 

 *569
 

 *441
 
 (e) conduct unbecoming a state employee that is detrimental to state service;
 

 (f) the abuse of client(s), patient(s), student(s) or a person(s) over whom the employee has charge or to whom the employee has a responsibility or an animal owned by the State;
 

 (g) absence from work after all authorized leave credits and benefits have been exhausted;
 

 (h) falsification of a state application or in other employment documentation.
 

 25 N.C. Admin. Code 1J.0614(8).
 

 In
 
 Warren v. N.C. Dep't of Crime Control
 
 ,
 
 221 N.C. App. 376
 
 ,
 
 726 S.E.2d 920
 
 ,
 
 disc. review denied
 
 ,
 
 366 N.C. 408
 
 ,
 
 735 S.E.2d 175
 
 (2012), this Court articulated a three-part test to determine whether just cause exists to discipline an employee who has engaged in unacceptable personal conduct: (1) whether the employee actually engaged in the conduct the employer alleged; (2) whether the employee's conduct falls within one of the categories of unacceptable personal conduct; and (3) whether the misconduct constitutes just cause for the disciplinary action taken.
 
 Id.
 
 at 383,
 
 726 S.E.2d at 925
 
 (citation omitted).
 

 "The North Carolina Administrative Procedure Act (APA), codified at Chapter 150B of the General Statutes, governs trial and appellate court review of administrative agency decisions."
 
 Amanini v. N.C. Dep't of Human Res.
 
 ,
 
 114 N.C. App. 668
 
 , 673,
 
 443 S.E.2d 114
 
 , 117 (1994) (citation omitted). Chapter 150B of the North Carolina General Statutes provides, in pertinent part, as follows:
 

 The Court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced by the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 *442
 
 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 N.C. Gen. Stat. § 150B-51(b) (2017). In situations "[w]here the asserted error falls under subsections 150B-51(b)(5) and (6), we apply the whole record standard of review."
 
 Whitehurst v. East Carolina Univ.
 
 , --- N.C. App. ----, ----,
 
 811 S.E.2d 626
 
 , 631 (2018) (citation and quotation marks omitted).
 

 A court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter
 
 de novo
 
 . Rather, a court must examine all the record evidence-that which detracts from the agency's findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the agency's decision. "Substantial evidence" is defined as "relevant evidence a reasonable mind might accept as adequate to support a conclusion."
 

 Watkins v. N.C. State Bd. of Dental Exam'rs,
 

 358 N.C. 190
 
 , 199,
 
 593 S.E.2d 764
 
 , 769 (2004) (internal citations omitted).
 

 Where the petitioner alleges that the agency decision "was based on error of law, the reviewing court must examine the record
 
 de novo
 
 , as though the issue had not yet been considered by the agency."
 
 Souther v. New River Area Mental Health Development Disabilities & Substance Abuse Program
 
 ,
 
 142 N.C. App. 1
 
 , 4,
 
 541 S.E.2d 750
 
 , 752 (citation omitted),
 
 aff'd per curiam
 
 ,
 
 354 N.C. 209
 
 ,
 
 552 S.E.2d 162
 
 (2001). "Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the [ALJ]."
 
 In re Appeal of the Greens of Pine Glen Ltd. P'ship
 
 ,
 
 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003) (citation omitted).
 

 *570
 

 I. Specificity of Allegations in Dismissal Letter
 

 Initially, Smith contends that two of the five stated grounds for his discharge contained in the Dismissal Letter were not sufficiently specific to meet the notice requirements of the Human Resources Act. He asserts that the following two statements of misconduct set forth in Paragraph 1 of the letter were not stated with the requisite particularity:
 

 *443
 
 b. As cited above, I recently learned that you have made critical statements about me to several others in our division most especially since the Fall of 2015 and that the pattern of your open and public criticism of me has harmed the cohesiveness of CTE.
 

 c. In recent months, you have openly and with several CTE staff, noted that you have a "lawsuit" against [DPI] because [DPI] is discriminatory toward men. The statements you have made, your behavior such as posting the dress guidelines repeatedly has harmed the cohesiveness in CTE, and is unbecoming conduct of a CTE leader.
 

 N.C. Gen. Stat. § 126-35
 
 (a) provides that before a career State employee may be discharged, "the employee shall ... be furnished with a statement in writing setting forth the specific acts or omissions that are the reasons for the [termination]."
 
 N.C. Gen. Stat. § 126-35
 
 (a). This Court has stated that the purpose of the statute's notice requirement is to "provide the employee with a written statement of the reasons for his discharge so that the employee may effectively appeal his discharge."
 
 Heard-Leak
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at 398
 
 (citation and quotation marks omitted);
 
 see also
 

 Owen v. UNC-G Physical Plant
 
 ,
 
 121 N.C. App. 682
 
 , 687,
 
 468 S.E.2d 813
 
 , 817 (1996) ("Failure to provide names, dates, or locations makes it impossible for the employee to locate the alleged violations in time or place, or to connect them with any person or group of persons, thereby violating the statutory requirement of sufficient particularity." (internal citations, quotation marks, and brackets omitted) );
 
 Leiphart v. N.C. School of the Arts
 
 ,
 
 80 N.C. App. 339
 
 , 351,
 
 342 S.E.2d 914
 
 , 922 (
 
 N.C. Gen. Stat. § 126-35
 
 (a) "was designed to prevent the employer from summarily discharging an employee and then searching for justifiable reasons for the dismissal"),
 
 cert. denied
 
 ,
 
 318 N.C. 507
 
 ,
 
 349 S.E.2d 862
 
 (1986). Consequently, "the written notice must be stated with sufficient particularity so that the discharged employee will know precisely what acts or omissions were the basis of his or her discharge."
 
 Heard-Leak
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at 398
 
 (citation, quotation marks, and brackets omitted).
 

 Smith argues that the above-quoted statements from the Dismissal Letter are insufficient under
 
 N.C. Gen. Stat. § 126-35
 
 (a) because they fail to provide "the names of the people [Smith] allegedly spoke to, the dates when he allegedly spoke to them or what he said." He does not, however, contend that the remaining grounds set out in paragraph (1)(a) and in paragraph (2)(a) and (b) of the Dismissal Letter were impermissibly
 
 *444
 
 vague. Instead, his argument on this issue solely references the grounds listed in paragraph (1)(b) and (c) of the letter.
 

 The Dismissal Letter-a single-spaced document that was over four pages in length-contained additional information elaborating on the specific grounds for dismissal identified in the letter. While it is true that the letter could have provided additional detail as to the grounds Smith references, we note that he does not argue that any such lack of detail actually prevented him from contesting the grounds for his dismissal.
 

 In any event, even assuming
 
 arguendo
 
 that the grounds listed in paragraph (1)(b) and (c) of the Dismissal Letter were too vague, we conclude-as discussed in more detail below-that the remaining grounds set out in the letter were sufficient to support his discharge.
 
 See
 

 Hilliard v. N.C. Dep't of Corr.
 
 ,
 
 173 N.C. App. 594
 
 , 597,
 
 620 S.E.2d 14
 
 , 17 (2005) ("One act of [unacceptable personal conduct] presents just cause for any discipline, up to and including dismissal." (citation and quotation marks omitted) ).
 

 II. Existence of Just Cause For Dismissal
 

 a. Whether Smith Engaged in the Alleged Conduct
 

 Smith does not challenge Findings of Fact Nos. 40-43, 53-54, and 59 made by the
 
 *571
 
 ALJ. Thus, these factual findings are binding on appeal.
 
 See
 

 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal."). Finding Nos. 40-43 concern Smith's 8 December 2015 altercation with Short while Finding Nos. 53-54 and 59 relate to Smith's conduct during Verdu's job interview and his LinkedIn account activity, respectively. Thus, because these findings have not been challenged by Smith, they establish that Smith did, in fact, engage in the conduct described therein. Accordingly, the first prong of the
 
 Warren
 
 test is satisfied with regard to these acts that formed the basis for Smith's discharge.
 

 b. Whether Smith's Actions Constituted Unacceptable Personal Conduct
 

 We must next determine whether Smith's behavior rose to the level of unacceptable personal conduct. As noted above, unacceptable personal conduct under the Human Resources Act is a broad "catch-all" category that encompasses a wide variety of misconduct by State employees that can result in dismissal without the need for a prior warning. This Court has found the existence of unacceptable personal conduct in a number of different contexts.
 
 See, e.g.,
 

 *445
 

 Robinson v. Univ. of N.C. Health Care Sys.
 
 ,
 
 242 N.C. App. 614
 
 , 617,
 
 775 S.E.2d 898
 
 , 900 (2015) (hospital employee displayed explosive behavior in meetings, showed disrespect for her supervisors, and repeated unsupported claims that employer was discriminating against her);
 
 Hilliard
 
 ,
 
 173 N.C. App. at 596
 
 ,
 
 620 S.E.2d at 16
 
 (superintendent of correctional center improperly ate food from dining hall, accepted personal services from inmates and employees, and used State equipment to send personal faxes and make non-work related long distance telephone calls);
 
 N.C. Dep't of Corr. v. Brunson
 
 ,
 
 152 N.C. App. 430
 
 , 432,
 
 567 S.E.2d 416
 
 , 418 (2002) (probation officer held in contempt of court for talking during proceeding after magistrate ordered silence). Furthermore, with regard to the "conduct unbecoming a state employee" prong of the unacceptable personal conduct definition, we have held that "no showing of actual harm is required ..., only a potential detrimental impact (whether conduct like the employee's could potentially adversely affect the mission or legitimate interests of the State employer").
 
 Hilliard
 
 ,
 
 173 N.C. App. at 597
 
 ,
 
 620 S.E.2d at 17
 
 (citation omitted).
 

 It is undisputed that on 8 December 2015 Smith became involved in a loud confrontation with Short that was precipitated by his dissatisfaction with a planned "Ugly Christmas Sweater" contest. During the altercation-which was overheard by several colleagues-he became "visibly and audibly upset," referred to the contest as "another example of how women at DPI made all the decisions," and accused Short of being responsible for the removal of Internet Technology courses from his section. This incident resulted in Short believing that Smith had harassed her because of her gender and had created a hostile work environment for female employees at DPI.
 

 Smith also engaged in highly inappropriate conduct during Verdu's interview for the health science consultant position. He informed Verdu that he and Honeycutt "did not get along well and that [Honeycutt] discriminated against him because he was male." Smith also told Verdu that he was considering filing a lawsuit against DPI for discrimination, criticized the work environment at CTE, and gave Verdu his personal cell phone number so that she could immediately inform him if she decided to withdraw her application from consideration. Finally, his conduct in "liking" two sexually suggestive LinkedIn posts while using an account in which he identified himself as an employee of DPI represented yet another instance of inappropriate behavior.
 

 We are satisfied that Smith's actions had the potential to adversely affect the mission of DPI and constituted conduct unbecoming a State employee that is detrimental to State service. Therefore, we hold that
 
 *446
 
 the ALJ did not err in determining Smith's actions constituted unacceptable personal conduct under the Human Resources Act.
 

 c. Whether Smith's Conduct Constituted Just Cause for His Dismissal
 

 The final question before us is whether Smith's improper conduct gave rise
 
 *572
 
 to just cause for his termination as opposed to a lesser form of disciplinary action. This Court has held that "[u]nacceptable personal conduct does not necessarily establish just cause for all types of discipline."
 
 Warren
 
 ,
 
 221 N.C. App. at 383
 
 ,
 
 726 S.E.2d at 925
 
 . Thus, the final prong of the
 
 Warren
 
 test requires us to "balance the equities" by "examin[ing] the facts and circumstances of [the] case" in order to determine whether the "conduct constitutes just cause for the [specific type of] disciplinary action taken."
 
 Id.
 
 at 379, 382,
 
 726 S.E.2d at 923, 925
 
 .
 

 Here, Smith displayed a pattern of petulant, inappropriate, and insubordinate behavior at DPI that extended over the course of several years. Despite repeated attempts on the part of Honeycutt and others at DPI to convince him to behave more appropriately, Smith failed to make any meaningful changes to his workplace behavior.
 

 Smith nevertheless argues that the ALJ erred in making certain findings of fact that were not directly connected to those grounds for his termination that were stated with specificity in his Dismissal Letter. Specifically, he contends that Findings of Fact Nos. 8-38, 44-52, 57-58, 60, 62, 64, 65, and 67 were made in error because they "deal with subjects that are not contained in the dismissal letter as reasons for the dismissal."
 
 [2]
 
 We disagree.
 

 Although it is true that some of these factual findings concern events not expressly referenced within the four corners of the Dismissal Letter, we do not believe that their inclusion was improper. Our appellate courts have held that an employee's work history is a relevant consideration in reviewing the level of discipline imposed against a career State employee.
 
 See, e.g.,
 

 Blackburn v. N.C. Dep't of Pub. Safety
 
 ,
 
 246 N.C. App. 196
 
 , 208,
 
 784 S.E.2d 509
 
 , 518 ("[E]vidence of petitioner's prior disciplinary history was properly considered as part of the ALJ's review of the level of discipline imposed against petitioner."),
 
 disc. review denied
 
 ,
 
 368 N.C. 919
 
 ,
 
 786 S.E.2d 915
 
 (2016) ;
 
 see also
 

 N.C. Dep't of Env't & Natural Res.
 
 , 358 N.C. at 670,
 
 599 S.E.2d at 901
 
 (determining that agency lacked
 
 *447
 
 just cause to demote petitioner where petitioner had been "a reliable and valued employee ... for almost twenty years with no prior history of disciplinary actions against him.").
 

 In the present case, the factual findings made by the ALJ that Smith challenges as beyond the scope of the Dismissal Letter concern a number of incidents that occurred during his employment at DPI. Among other subjects, these challenged findings of fact reference (1) inflammatory emails sent by Smith to employees of DPI partner organizations; (2) inappropriate attire worn by Smith to work functions; (3) Smith's failure to give his scheduled presentation during the 22 September 2014 DPI conference; and (4) the misleading reference given by Smith to DOL staff and the official warning letter for misconduct that he received as a result. These findings serve to support the legal validity of DPI's determination that Smith's repeated misconduct warranted his dismissal.
 

 * * *
 

 Although the North Carolina Human Resources Act provides important protections for career State employees, it does not immunize workers from discharge after engaging in the type of longstanding insubordinate and highly inappropriate behavior that occurred here. Therefore, we affirm the ALJ's conclusion that just cause existed for Smith's dismissal.
 

 Conclusion
 

 For the reasons stated above, we affirm the 21 August 2017 Final Decision of the ALJ.
 

 AFFIRMED.
 

 Judges DILLON and INMAN concur.
 

 [1]
 

 The EEOC dismissed Smith's complaint on 7 March 2016.
 

 [2]
 

 We note that the only finding of fact actually challenged by Smith as unsupported by substantial evidence in the record is Finding No. 64.