IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1076

Filed: 31 December 2020

Orange County, No. 18 CVS 1441

RICHARD C. SEMELKA, M.D., Petitioner,

v.

THE UNIVERSITY OF NORTH CAROLINA, and THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Respondents.

Appeal by Petitioner and cross-appeal by Respondents from order entered 25 April 2019 by Judge Allen Baddour in Superior Court, Orange County. Heard in the Court of Appeals 8 September 2020.

*Law Office of Barry Nakell, by Barry Nakell, for Petitioner-Appellant/Cross Appellee.*

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Vanessa N. Totten, Special Deputy Attorney General Kimberly Potter, and Assistant Attorney General Zachary Padget, for Respondents-Appellees/Cross-Appellants.*

McGEE, Chief Judge.

Richard C. Semelka, M.D. ("Petitioner") appeals and the University of North Carolina ("UNC") and the University of North Carolina at Chapel Hill ("UNC-CH") (collectively, "Respondents") cross-appeal from the trial court's order affirming the UNC Board of Governors' ("BOG") decision to discharge Petitioner from his employment and reversing the BOG's decision that UNC-CH could cease payment of

Petitioner's salary following the decision of UNC-CH's Board of Trustees ("BOT"). We affirm.

## I. Factual and Procedural Background

Petitioner was previously employed as the Director of Quality and Safety of Radiology and a Professor of Radiology within UNC-CH's School of Medicine's Department of Radiology. Between 2011 and 2015, Petitioner sent numerous emails to administrators within the Department of Radiology, the Office of the Dean of UNC-CH's School of Medicine, and UNC-CH's Office of University Counsel ("OUC") regarding safety concerns relating to the conduct of certain colleagues within the Radiology Department. Petitioner learned in January of 2016 that he had not been selected to fill the position that he had applied for – Division Chief of Abdominal Imaging. Petitioner sent UNC-CH Chancellor Carol Folt ("Chancellor Folt") a letter on 8 January 2016 expressing his concerns with how the Department of Radiology's administrators handled the investigations into his complaints and asserting his grievances with Department Chair, Dr. Matthew Mauro ("Dr. Mauro"), as well as certain other colleagues. In addition to alleging a "dereliction of responsibility by [Dr.] Mauro," Petitioner asserted that Dr. Mauro retaliated against him by "not appointing [him] as the [D]ivision [C]hief of Abdominal Imaging, but rather selected the only outside candidate that applied."

In response to Petitioner's letter to Chancellor Folt, the Executive Vice Chancellor and Provost, Dr. James W. Dean, Jr. ("Provost Dean"), sent Petitioner a letter on 21 January 2016 stating that he had read Petitioner's email to Chancellor Folt and spoken with "several people connected to the events that [Petitioner] describe[d]." Provost Dean informed Petitioner that a "thorough investigation" had been conducted into each of Petitioner's previously-communicated concerns. The letter rejected Petitioner's claim that he was retaliated against by Dr. Mauro, explaining that "any personnel decision is open to a number of interpretations, and may have been made based on a number of factors." Finally, Provost Dean outlined the faculty grievance process for Petitioner "to further pursue [his] concerns."

Petitioner retained the law firm of Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz Levin") in February of 2016. In an engagement letter dated 5 February 2016, Mintz Levin advised Petitioner that "[t]he Firm will represent and advise you with regard to issues concerning the University of North Carolina at Chapel Hill, and related matters." Petitioner submitted an expense reimbursement request to the Department of Radiology's Associate Chair for Administration, Bob Collichio ("Mr. Collichio"), on 13 July 2016. Petitioner sought reimbursement from the Radiology Operating Fund[1] for approximately $30,000 in legal fees he had paid

---

[1] The Radiology Department Operating Fund operates in accordance with the UNC School of Medicine Faculty Affairs Code ("Faculty Affairs Code") and the Policy on Clinical Department Faculty Providing Expert Legal Services and Testimony ("Expert Legal Services"). Under these policies, every

to Mintz Levin. As justification for his request for reimbursement of legal fees, Petitioner sent Mr. Collichio a series of four emails explaining the "business-related" reasons he had hired Mintz Levin.

Mr. Collichio sought the assistance of OUC in determining whether any of Petitioner's legal expenses were reimbursable. In a 25 July 2016 email, Mr. Collichio informed Petitioner that he had not "provide[d] enough detail to make any decision on what can be reimbursed or not," and asked Petitioner to submit additional documentation in support of his request. In response, Petitioner sent Mr. Collichio the engagement letter from Mintz Levin, a partially redacted Mintz Levin invoice for February in the amount of $14,861.80, a partially redacted Mintz Levin invoice for March in the amount of $10,780.60, and an April invoice in the amount of $1,833.60. Petitioner informed Mr. Collichio in a 5 August 2016 email of his intention to terminate Mintz Levin because he had been charged "more money that [he had] derived benefit from." Petitioner also expressed frustration that his reimbursement request had not been approved and offered to personally meet with OUC.

---

clinical department within the School of Medicine has an established Departmental Operating Fund "to receive collections for professional services" related to patient care, including income generated for expert witness testimony by faculty members within that department. The Faculty Affairs Code expressly provides that funds within a Departmental Operating Fund "may not be used to fund items which would be construed as non-business or personal in nature." Instead, "[f]unds deposited into Departmental Operating Funds may be expended on approved budgeted items which serve to maintain and/or improve the departmental capabilities in the areas of teaching, research, patient care, and public service[,]" including "expenses incurred as a result of appropriate professional travel, attendance at meetings" and "expenditures for supplies and general operational costs[.]"

In a 23 August 2016 email, Mr. Collichio informed Petitioner that OUC had provided feedback that was "not good news." The email explained that Petitioner's request for reimbursement of legal fees could not be honored because Petitioner did not get prior approval by OUC and "faculty do not have the authority to bind the University in contract for outside counsel," as "these are the decisions made by the OUC." The email also stated that OUC "looked at the line items in the invoices [Petitioner] provided, and, though vague, they do not appear to align with all of the reasons [Petitioner] provided as the purpose of retaining outside counsel."

At the request of the OUC, in August of 2016, UNC-CH's Director of Internal Audit Department, Phyllis Petree ("Ms. Petree"), commenced an investigation into Petitioner's request for reimbursement of legal fees. Ms. Petree also initiated an audit into Petitioner's prior travel and business reimbursements from the Radiology Operating Fund from July 2010 to September 2016. In a final audit report entered 5 January 2017, Ms. Petree concluded that "the primary purpose of the law firm engagement giving rise to the legal fees in question was for personal matters, though [Petitioner] initially represented that the fees were for consultation related to cybersecurity and to his University duties." Additionally, Ms. Petree concluded that between September 2010 and September 2016, Petitioner "claimed and was reimbursed for costs of nine trips that were primarily personal in nature and were not reimbursable as business travel."

In a letter dated 11 January 2017, Provost Dean informed Petitioner of his intention to discharge him from his employment as a professor at UNC-CH for misconduct under the *Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill* (the "Tenure Policy").[2] Relying on Ms. Petree's audit report, the letter stated that Petitioner submitted to the Radiology Department a request for reimbursement of $30,000 in legal fees, "knowingly representing that these expenses were incurred for legal advice regarding [his] work performed for the University when, instead, these legal services were obtained for primarily personal reasons, including pursuing legal action against the University." Provost Dean described Petitioner's behavior as "inappropriate and unethical conduct that may also constitute a criminal violation" and found "this significant act alone constitutes misconduct of such a nature to indicate that [Petitioner is] no longer fit to be a member of the faculty[.]" The letter stated that "[f]urther contributing to a pattern of dishonesty and false representations, [Ms. Petree] thereafter discovered that, over the past five years, [Petitioner had] established a practice of improperly seeking full reimbursement from the University for trips that were personal in nature." According to Provost Dean, Petitioner's behavior was "sufficiently serious as to adversely reflect on [his] honesty, trustworthiness and fitness to be a faculty

---

[2] Pursuant to Section 3(a)(1) of the Tenure Policy, discharge is appropriate when a tenured faculty member engages in misconduct "sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness or fitness to be a faculty member."

member" and his "actions constitute misconduct of such a nature as to indicate that [Petitioner] is no longer fit to be a member of the faculty[.]" The letter informed Petitioner of his right to appeal the decision and explained that pursuant to Section 3 of the Tenure Policy, Petitioner was suspended "pending [his] discharge or other resolution of [the] matter," but that his suspension would be "with full pay."

On that same day, the Executive Dean of the School of Medicine, Dr. Wesley Burks ("Dr. Burks") sent Petitioner a letter outlining "the specific terms of [his] suspension from employment pursuant to Section 3(b)(9)" of the Tenure Policy. The letter explained that Petitioner would continue to receive his full pay during his suspension, which was "effective immediately and shall continue until a final decision concerning [his] discharge from employment."

Petitioner appealed Provost Dean's decision to the UNC-CH Faculty Hearings Committee (the "Faculty Hearings Committee") on 11 January 2017, in accordance with the Tenure Policy.[3] The matter was heard by a five-member panel over the course of three days. At the hearing, Petitioner argued that he was the victim of retaliation on behalf of UNC-CH based on the safety concerns he had previously raised. The Faculty Hearings Committee submitted a memorandum to Chancellor Folt on 23 May 2017 with its findings and its unanimous recommendation that

---

[3] The Tenure Policy authorized Petitioner to appeal his termination by requesting a hearing before a panel of at least five members of the Faculty Hearings Committee. Following the hearing, the findings and recommendations of the Faculty Hearings Committee are submitted to Chancellor Folt for her adoption or rejection.

Chancellor Folt uphold Provost Dean's decision to discharge Petitioner. Finding that UNC-CH's investigations into Petitioner's concerns revealed no evidence of retaliation against Petitioner, the Faculty Hearings Committee rejected Petitioner's retaliation claim. Specifically, the Faculty Hearings Committee concluded:

> Dr. Semelka's choice to seek reimbursement for $30,000 worth of legal fees and his description of the need for this outside legal consultation as being related to various activities such as writing books or considering new safety procedures was disingenuous and dishonest. Indeed, he eventually admitted to Ms. Petree that a significant portion (40%) of his conversations with Mintz Levin were related to taking legal action against the University. *Such conduct constitutes misconduct of such a nature as to adversely reflect on Dr. Semelka's honesty, trustworthiness and fitness to be a faculty member. Therefore, we find Dr. Semelka's conduct was of such a nature as to indicate that he is unfit to continue as a member of the faculty.* We were not convinced that the travel improprieties noted by Ms. Petree by themselves rose to the level requiring discharge since those requests were clear, did reference at least some University-related meetings, and went through multiple levels of review before being granted.

(Emphasis added).

In a letter dated 9 June 2017, Chancellor Folt notified Petitioner of her decision to accept the "findings and recommendations" of the Faculty Hearings Committee:

> I concur and determine that you engaged in misconduct that was sufficiently serious so as to adversely reflect on your honesty, trustworthiness or fitness to be a faculty member. I further concur and determine that your actions constitute misconduct of such nature as to render you unfit to serve as a member of the faculty at the University. I also concur with the Committee's findings that the University

> investigated your prior safety concerns and that no evidence indicated that the University took employment action against you for voicing such concerns. Accordingly, I agree that discharge is the appropriate sanction for your misconduct.

The letter also apprised Petitioner of his right to seek review of Chancellor Folt's decision by the BOT under Section 3(b)(8) and Section 8 of the Tenure Policy.[4]

Petitioner appealed Chancellor Folt's decision to the BOT on 17 June 2017. The BOT affirmed Chancellor Folt's decision on 1 August 2017, finding that Chancellor Folt "did not commit clear and material error" either (1) "when she concurred with the [Faculty Hearings Committee's] unanimous recommendation and determined [Petitioner] engaged in misconduct that was sufficiently serious so as to adversely reflect on his honesty, trustworthiness or fitness to be a faculty member" or (2) "when she concurred with the [Faculty Hearings Committee's] unanimous recommendation and determined [Petitioner's misconduct] was of such a nature as to render him unfit to serve as a member of the faculty at [UNC-CH]."

Petitioner appealed[5] the BOT's decision to the BOG on 10 August 2017. In addition to his request that the BOG "reverse the improper decision that ha[d] been

---

[4] Under Section 8(2) of the Tenure Policy, the BOT may review, *inter alia*, "[a] decision by the Chancellor under 3.b.8. concurring in a [Faculty] [H]earings [Co]mmittee recommendation unfavorable to the faculty member." The BOT's review is limited, however, to "the question of whether the Chancellor or the [Faculty] [H]earings [C]ommittee, as the case may be, committed clear and material error in reaching the decision under review."

[5] Section 8 of the Tenure Policy enabled Petitioner to appeal the BOT's decision to the BOG "alleging with particularity the specific provisions of *The Code*" which Petitioner "alleges to have been violated."

made about [his] employment at UNC[,]" Petitioner also asked the BOG to bring in an independent investigator to assess the circumstances of his dismissal and "the background misconduct in the School of Medicine." Provost Dean sent Petitioner a letter on 24 August 2017 confirming UNC-CH's final decision to discharge him and explaining that Petitioner's final paycheck would reflect wages paid through 1 August 2017 – the date of the BOT's decision. In a 26 October 2017 position statement to the BOG, Petitioner asserted his salary should not have been terminated "while the appeal process is ongoing."

In a decision entered 12 September 2018, the BOG affirmed UNC-CH's dismissal decision, concluding that "there [was] sufficient evidence in the record to determine that [Petitioner] knowingly misrepresented that multiple reimbursement requests for legal and travel expenses were for university purposes when, in fact, substantial portions of the expenses were for personal purposes, constituting misconduct under Section 603(1) of *The Code*."[6] The BOG rejected Petitioner's retaliation claim, finding "insufficient evidence to support [Petitioner's] claim that UNC-CH selected another candidate for the Division Chief Position or chose to discharge [Petitioner] from employment as acts of retaliation against him for reporting safety concerns about colleagues to UNC-CH administrators." Moreover, the BOG rejected Petitioner's salary claim, finding:

---

[6] Throughout this opinion, we refer to "*The Code of the Board of Governors of the University of North Carolina*" as "*The Code*."

> The [BOG's] interpretation of its own policy in Section 603(10) is that the final decision concerning discharge from employment at a constituent institution is the decision made by a constituent institution's chancellor. The surrounding language in Section 603(10) supports this interpretation. Section 603(9) states that "the chancellor's decision shall be final." Additionally, Section 603(9) refers to consideration of the chancellor's final decision by a board of trustees or the [BOG] as an "appeal." Because Chancellor Folt made a final decision consistent with Section 603(9) with regard to [Petitioner's] discharge from employment on June 9, 2017, [Petitioner] is not entitled to pay beyond June 9, 2017.

Petitioner filed a petition for judicial review in Superior Court, Orange County. A hearing on the petition was conducted on 18 March 2019. The trial court entered an order on 25 April 2019 affirming the BOG's decision to discharge Petitioner from his employment and reversing the BOG's decision to stop payment of Petitioner's salary as of the date of the BOT's decision. Petitioner appeals and Respondents cross-appeal from the order.

## II.    Direct Appeal

On appeal, Petitioner argues that: (1) the BOG violated its policy by considering dismissed allegations of travel expense reimbursement violations, (2) Petitioner did not commit misconduct sufficiently serious to justify his discharge, (3) discharge was an excessive discipline and UNC wrongfully failed to consider any discipline less than discharge, and (4) the decision to discharge Petitioner was an unjust and arbitrary application of disciplinary penalties because of the way that

UNC-CH officials "set up" Petitioner and misrepresented the evidence of the purpose of his relationship with Mintz Levin.

## A. Standard of Review

"The North Carolina Administrative Procedure Act (APA), codified at Chapter 150B of the General Statutes, governs trial and appellate court review of administrative agency decisions." *Amanini v. N.C. Dep't of Human Res.*, 114 N.C. App. 668, 673, 443 S.E.2d 114, 117 (1994). "'When a superior court exercises judicial review over an agency's final decision, it acts in the capacity of an appellate court[,]'" *Bernold v. Bd. of Governors of Univ. of N.C.,* 200 N.C. App. 295, 297, 683 S.E.2d 428, 430 (2009) (citation omitted), and "'the substantive nature of each assignment of error dictates the standard of review[,]'" *Wetherington v. N.C. Dep't of Pub. Safety*, 368 N.C. 583, 590, 780 S.E.2d 543, 546 (2015) (citations omitted). The scope of a superior court's judicial review is limited as follows:

> (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
>
> (3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2019).  This Court's review

> under the APA is the same as it is for other civil cases. Thus, our appellate courts have recognized that the proper appellate standard for reviewing a superior court order examining a final agency decision is to examine the order for errors of law.  Our appellate courts have further explained that this twofold task involves: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly.  As a result, this Court has required that the trial court, when sitting as an appellate court to review an administrative agency's decision, must set forth sufficient information in its order to reveal the scope of review utilized and the application of that review.

*EnvironmentaLEE v. N.C. Dep't of Env't & Nat. Res.*, 258 N.C. App. 590, 595, 813 S.E.2d 673, 677 (2018) (internal citations, quotation marks, and brackets omitted).

"Our Supreme Court has observed that the first four grounds enumerated under [N.C. Gen. Stat. § 150B-51(b)] may be characterized as law-based inquiries, whereas the final two grounds may be characterized as fact-based inquiries." *Sound Rivers, Inc. v. N.C. Dep't of Envtl. Quality, Div. of Water Res.*, ___ N.C. App. ___, ___, 845 S.E.2d 802, 816 (2020).  "Where the petitioner alleges that the agency decision was based on error of law, the reviewing court must examine the record *de novo*, as

though the issue had not yet been considered by the agency." *Avant v. Sandhills,* 132 N.C. App. 542, 546, 513 S.E.2d 79, 82 (1999) (citations omitted). For alleged errors under subsections 150B-51(b)(5) and (6)—the fact-based inquiries—we apply the whole record standard of review. *Smith v. N.C. Dep't of Pub. Instruction*, 261 N.C. App. 430, 442, 820 S.E.2d 561, 569 (2018).

In the present case, the trial court applied *de novo* review to Petitioner's first argument and whole record review to Petitioner's remaining three assertions. Petitioner does not contend that the trial court applied the wrong standard of review; as a result, this Court's review is limited to deciding whether the trial court properly exercised the appropriate standard of review. *EnvironmentaLEE*, 258 N.C. App. at 595, 813 S.E.2d at 677.

### B. De Novo Review

Petitioner argues that the BOG violated its own policy—under the Tenure Policy and *The Code*—because it considered dismissed allegations of travel expense reimbursement violations in its decision. This assertion presents a law-based inquiry as to whether the BOG's decision was in excess of its statutory authority or jurisdiction, made upon unlawful procedure, and/or affected by other errors of law; therefore, *de novo* review is appropriate. *Avant*, 132 N.C. App. at 546, 513 S.E.2d at 82. Under a *de novo* review,

> [t]he agency's decision is presumed to be made in good faith
> and in accordance with governing law. Therefore, the

burden is on the party asserting otherwise to overcome such presumptions by competent evidence to the contrary when making a claim that the decision was affected by error of law or procedure.

*Richardson v. N.C. Dep't of Pub. Instruction Licensure Section*, 199 N.C. App. 219, 223–24, 681 S.E.2d 479, 483 (2009) (citation omitted).

*The Code* § 603(9) provides: "If the chancellor concurs in a recommendation of the committee that is favorable to the faculty member, the chancellor's decision shall be final."[7] Petitioner contends that the BOG violated *The Code* § 603(9) because it considered evidence of Petitioner's dishonesty relating to his travel expense reimbursement requests—a ground that had been "rejected" by the Faculty Hearings Committee—in its decision to terminate Petitioner. As support for his assertion, Petitioner notes the following pertinent facts.

When Provost Dean informed Petitioner by letter that he intended to discharge him, he stated that Petitioner's $30,000 reimbursement request for legal fees "alone constitutes misconduct of such a nature as to indicate that [Petitioner is] no longer fit to be a member of the faculty of this University." The letter also stated that "[f]urther contributing to a pattern of dishonesty and false representations, [Ms. Petree] thereafter discovered that, over the past five years, [Petitioner] ha[d] established a practice of improperly seeking full reimbursement from the University

---

[7] The Tenure Policy § 3(b)(8) contains almost identical language to *The Code* § 603(9): "If the Chancellor concurs in a recommendation of the hearing committee that is favorable to the faculty member, his or her decision shall be final."

for trips that were primarily personal in nature." In its 23 May 2017 memorandum to Chancellor Folt, the Faculty Hearings Committee concluded that Petitioner's reimbursement request for $30,000 in legal fees was "disingenuous and dishonest" and "of such a nature as to indicate that he is unfit to continue as a member of the faculty[;]" however, they "were not convinced that the travel improprieties noted by Ms. Petree by themselves rose to the level requiring discharge since those requests were clear, did reference at least some University-related meetings, and went through multiple levels of review before being granted." Notably, the memorandum contained the Faculty Hearings Committee's recommendation to Chancellor Folt: "The Faculty Hearings Committee unanimously recommends that the Chancellor uphold Provost Dean's decision to discharge [Petitioner] from the faculty of the University. The Committee finds that permissible grounds for discharge under the Tenure Policy exist."

According to Petitioner, when Chancellor Folt "accept[ed] the [Faculty Hearings] Committee's findings and recommendations" on 9 June 2017, the travel reimbursement allegation was resolved in favor of Petitioner and constituted a final decision under *The Code* § 603(9). As a result, Petitioner argues that the BOG's decision improperly referenced "the dismissed allegations of travel expense improprieties" when it found "evidence related to [Petitioner's] reimbursements for travel or a personal nature over a period of several years supports UNC-CH's

decision-maker's finding that [Petitioner] engaged in 'a pattern of dishonesty and false representations.'" On judicial review, the trial court concluded:

> 5. After a *de novo* review, the decision to discharge Petitioner from his position at UNC-CH based on his misconduct was not in violation of any constitutional provisions, in excess of the statutory authority or jurisdiction of the agency, made upon lawful procedure or affected by another error of law. Moreover, the decision to discharge Petitioner was properly made and was consistent with the requirements of *The Code*.

Petitioner contends that "[b]ecause the BOG did not uphold the discharge decision on the basis of the attorney's fee reimbursement request alone, and violated UNC policy by relying on finally dismissed allegations, the Superior Court could not remedy that Policy violation by deciding in its opinion that the one violation was sufficient to support the BOG decision."

As an initial matter, we reject Petitioner's characterization of the Faculty Hearings Committee's decision as "reject[ing] the allegation with regard to the travel reimbursement request." A review of the memorandum to Chancellor Folt reveals that the travel reimbursement allegation was *not* rejected. Indeed, the Faculty Hearings Committee "found that Ms. Petree's audit revealed that there were multiple instances dating from 2011 in which [Petitioner] was reimbursed by the University for travel that appeared to be primarily personal in nature[.]" The Faculty Hearings Committee further found that Petitioner's "*pattern* is repeated in multiple trips, suggesting that his personal travel was primary in many cases and that brief

meetings with colleagues were used to justify multiple days of travel reimbursement requests." (Emphasis added). However, the Faculty Hearings Committee concluded that it was "not convinced that the travel improprieties noted by Ms. Petree *by themselves* rose to the level requiring discharge since those requests were clear, did reference at least some University-related meetings, and went through multiple levels of review before being granted." (Emphasis added). We do not believe that the Faculty Hearings Committee's conclusion—that Petitioner's reimbursement requests for travel expenses, on their own, did not rise to the level of discharge—compels the conclusion that the Faculty Hearings Committee "rejected" the allegation, especially in light of the memorandum's references to Petitioner's "pattern" of justifying reimbursement requests for primarily personal travel with brief meetings with colleagues.

However, assuming *arguendo* that the Faculty Hearings Committee had "rejected" the allegation of travel expense violations, we disagree with Petitioner that Chancellor Folt's adoption of the Faculty Hearings Committee's findings and recommendation constituted a "final" decision in favor of Petitioner that removed the travel reimbursement issue from the case. The plain language of *The Code* § 603(9) provides that "the chancellor's decision shall be final" if she "concurs *in a recommendation* of the committee that is favorable to the faculty member[.]" (Emphasis added). Although Chancellor Folt's letter to Petitioner stated that she

was agreeing with the "findings and recommendations" of the Faculty Hearings Committee, the memorandum to Chancellor Folt provided a *singular* recommendation: "The Faculty Hearings Committee unanimously recommends that the Chancellor uphold Provost Dean's decision to discharge [Petitioner] from the faculty of the University. The Committee finds that permissible on that grounds for discharge under the Tenure Policy exist."

The Faculty Hearings Committee's singular recommendation to Chancellor Folt to "uphold Provost Dean's decision to discharge [Petitioner] from the faculty" was *not* "favorable" to Petitioner. Accordingly, Chancellor Folt's adoption of the Faculty Hearings Committee's recommendation was not "final" under *The Code* § 603(9). As a result, we hold that Petitioner has not overcome the presumption that the BOG's decision to discharge Petitioner from his employment was made "in good faith and in accordance with governing law." *Richardson*, 199 N.C. App. at 223–24, 681 S.E.2d at 483.

### C. Whole Record Test

Petitioner contends that he did not commit misconduct justifying discharge, his discharge was an excessive discipline in violation of the UNC policy, and the decision to discharge him was an unjust and arbitrary application of discretionary penalties. For these alleged errors, the reviewing court applies the "whole record"

test. *See Smith*, 261 N.C. App. at 442, 820 S.E.2d at 569. The North Carolina Supreme Court has descried the "whole record" test as follows:

> The whole record test requires the reviewing court to examine all competent evidence (the whole record) in order to determine whether the agency decision is supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Therefore, if we conclude there is substantial evidence in the record to support the Board's decision, we must uphold it. We note that while the whole-record test does require the court to take into account both the evidence justifying the agency's decision and the contradictory evidence from which a different result could be reached, the test does not allow the reviewing court to replace the [ ] Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*.

*Meads v. N.C. Dep't of Agric.,* 349 N.C. 656, 663, 509 S.E.2d 165, 170 (1998) (internal quotation marks, citations, and brackets omitted). "This Court has held that under the whole record test, administrative agency decisions may be reversed as arbitrary or capricious if they are patently in bad faith, or whimsical in the sense that they indicate a lack of fair and careful consideration or fail to indicate any course of reasoning and the exercise of judgment." *Richardson,* 199 N.C. App. at 224, 681 S.E.2d at 483 (internal quotation marks, citations, and brackets omitted).

### 1. Misconduct

Petitioner contends that he did not commit misconduct sufficiently serious to justify his discharge under *The Code* § 603(1).[8]  *The Code* § 603(1) includes "misconduct of such a nature as to indicate that the faculty member is unfit to continue as a member of the faculty" as one of the permissible grounds for discharging a tenured faculty member.  However, *The Code* § 603(1) establishes that

> [t]o justify serious disciplinary action, such misconduct should be either (i) sufficiently related to a faculty member's academic responsibilities as to disqualify the individual from effective performance of university duties, or (ii) sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness or fitness to be a faculty member[.]

Petitioner contends that the BOG's decision was not supported by substantial evidence because it was reasonable for him to seek reimbursement for legal fees he incurred when he sought "advice and assistance" from Mintz Levin regarding his concerns about his colleagues.  Petitioner maintains that he hired Mintz Levin to

---

[8] To support this assertion, Petitioner discusses "a compelling comparator" case in which the BOG "took no action" against Dr. William Roper, the former Medical School Dean, who committed "a more serious violation" than Petitioner's alleged conduct.  Petitioner requests this court take judicial notice of documents included in the appendix of his brief related to the Roper case.  On 5 June 2020, Respondents filed a "Motion to Strike" Petitioner's argument related to Roper and the documents attached to the appendix, arguing that they were neither part of the established record on appeal nor part of the administrative record before the agency and lower court.  Respondents filed a "Second Motion to Strike" on 2 July 2020 as to certain portions of Petitioner's reply brief referencing the Roper case and two disciplinary decisions from the North Carolina State Bar.  We allow Respondents' Motion to Strike and Respondents' Second Motion to Strike. *See West v. G.D. Reddick, Inc.*, 48 N.C. App. 135, 137, 268 S.E.2d 235, 236 (1980), *rev'd on other grounds*, 302 N.C. 201, 274 S.E.2d 221 (1981) ("The Court of Appeals can judicially know only what appears of record . . . . Matters discussed in a brief but not found in the record will not be considered by this Court. It is incumbent upon the appellant to see that the record is properly made up and transmitted to the appellate court." (internal citation omitted)).

write a letter to the BOT, not to initiate a lawsuit against UNC, and thus, he made no false statement in connection with his reimbursement request. Moreover, according to Petitioner, there is no evidence that any person had concerns about his ability to perform his duties[9] and, so, the decision to discharge him, "'the superstar faculty member within the Department of Radiology,' who endeavored commendable to safeguard the Department from true serious misconduct that endangered the health and safety of patients and staff, [was] not justified by the statements he made when he was set up by the University's stealth investigation of him."

A whole record review supports the BOG's conclusion that "there is sufficient evidence in the record to determine that [Petitioner] knowingly misrepresented that multiple reimbursement requests for legal and travel expenses were for University purposes when, in fact, substantial portions of the expenses were for personal purposes, constituting misconduct under Section 603(1) of *The Code*." Ms. Petree's audit report referenced several emails that Petitioner sent to Mintz Levin demonstrating that Petitioner knowingly misrepresented to Mr. Collichio the basis for his reimbursement request. For example, Petitioner began a 1 February 2016 email to Mintz Levin by stating, "I believe you are the attorney who represented [another former faculty member] against UNC a few years back." Petitioner proceeded to discuss his "[p]roof of retaliation" and his grievances with how

---

[9] Petitioner was dismissed for *misconduct* under The Code § 603(1)(c)(ii); dismissal of a faculty member for *incompetence* or *neglect of duty* is found under *The Code* §§ 603(1)(a) and (b).

administrators handled the safety concerns he had raised. Explaining that he did not "intend to run away with a settlement[,]" Petitioner noted that he "want[ed] a message sent to UNC." Petitioner stated his belief that "once a case has been established[,]" faculty and staff "who are aware of what has happened" will "step up and testify." Additionally, Petitioner expressed his willingness to "take over the chair position department of Radiology[.]" In a subsequent email to Mintz Levin, Petitioner stated his desire "to move forward with the case." Petitioner expressed his plan to ask for "at least $10 million" for "damages to career and personal life," noted the individuals he wanted dismissed from UNC, and stated, "[a]s fewer people get dismissed, the higher [he would] request the settlement." In a 30 August 2016 email admonishing Mintz Levin for unsatisfactory performance, Petitioner expressed his frustration that he was now having to "deal with a financial conflict with the attorney who [he] had hired to protect [him]."

However, the day after submitting his request for reimbursement of legal fees, Petitioner sent Mr. Collichio an email stating that that he had hired Mintz Levin because he "wanted to obtain a broad overview of operational aspects, responsibilities, duties, of major university organizations." Petitioner explained that in addition to seeking legal advice related to his "current work on a new disease" known as "gadolinium deposition disease[,]" he sought consultation in the areas of "physician burn-out, safety of work environments, [and] competency," which are "all

subjects that pertain directly to the role [he] serve[s] in the department of Radiology." In another email dated 18 July 2016, Petitioner noted additional subjects that he consulted with Mintz Levin about, including "nation-wide experiences and approaches to root cause analysis[,]" "nationwide experience with IRB [Institutional Review Board] and appropriate interaction[,]" "nationwide experience with FDA [Food and Drug Administration] and policies[,]" and "Focus on FDA IND [investigational new drug applications]." Thus, a review of the whole record reveals substantial evidence supporting the conclusion that Petitioner misrepresented the reasons he engaged Mintz Levin, constituting misconduct "sufficiently serious as to adversely reflect on [Petitioner's] honesty, trustworthiness or fitness to be a faculty member."

## 2. Excessive Discipline

Petitioner also argues "discharge was an excessive discipline and UNC wrongfully failed to consider any discipline less than discharge." *The Code §* 603(1) provides that "[a] faculty member who is the beneficiary of institutional guarantees of tenure shall enjoy protection against unjust and arbitrary application of disciplinary penalties."

Petitioner contends that UNC should have counseled him regarding its concerns or "considered progressive discipline, since [Petitioner] had never had any disciplinary action against him in 24 years on the faculty." As support for this

assertion, Petitioner cites cases where our courts utilized the "just cause" standard to review an agency's decision to discharge a state employee. *See* N.C. Gen. Stat. § 126-35(a) (2019) (providing that a career state employee subject to the North Carolina Human Resources Act may only be "discharged, suspended, or demoted for disciplinary reasons" upon a showing of "just cause"). However, as a tenured professor at UNC-CH, Petitioner is exempt from the provisions of the North Carolina Human Resources Act. *See* N.C. Gen. Stat. § 126-5(c1)(8) (2019). Thus, Petitioner's reliance on cases applying the "just cause" standard is misplaced. Moreover, as discussed above, there is substantial evidence in the record supporting the BOG's conclusion that Petitioner engaged in misconduct "sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness or fitness to be a faculty member." There is no provision in *The Code* requiring UNC to consider discipline less severe than discharge. Pursuant to *The Code*, this level of misconduct on behalf of a tenured faculty member is a permissible ground for termination.

### 3. Unjust and Arbitrary Application of Disciplinary Penalties

Petitioner also argues that "the decision to discharge [him] was an unjust and arbitrary application of disciplinary penalties because of the way that University officials set up [Petitioner] and misrepresented the evidence of the purpose of his relationship with Mintz [Levin]." According to Petitioner, "UNC embarked on a course of action to set [him] up for more serious discipline[,]" "[t]hey covertly invaded

his email[,]" and "[t]hen they selectively 'cherry picked' excerpts of emails they had obtained from their invasion of his email file to manufacture a false case that [he] had retained Mintz [Levin] to file a lawsuit against the University." Petitioner asserts that UNC "ignored the compelling evidence contradicting their theory[,]" including emails Petitioner sent to Mintz Levin clarifying "that his purpose was only to have Mintz [Levin] correspond with the BOT" and evidence that he "never provided Mintz [Levin] the funding necessary for a lawsuit against UNC, never discussed or made any arrangements for such funding in the emails UNC accessed and read, and never did file a lawsuit against UNC."

However, by submitting the reimbursement request for $30,000 in legal fees and emailing Mr. Collichio explanations that the BOG found to be "dishonest," it was Petitioner's actions that led UNC-CH to investigate Petitioner's affairs. Petitioner's representations to UNC-CH that his legal fees were reimbursable because they were "business related" prompted Mr. Collichio to request supporting documentation. Thus, it was Petitioner, not a covert action on behalf of UNC-CH, that placed Petitioner's communication with Mintz Levin directly at issue. As discussed above, a review of Petitioner's communication with Mintz Levin supports the determination that Petitioner misrepresented the nature of the legal expenses for which he sought reimbursement. Thus, Petitioner has failed to demonstrate that the BOG's decision to terminate him was made "patently in bad faith," lacked "fair and careful

consideration[,] or fail[ed] to indicate any course of reasoning and the exercise of judgment." *Richardson*, 199 N.C. App. at 224, 681 S.E.2d at 483.

For the reasons discussed above, as to Petitioner's direct appeal, we affirm.

III.     Cross-Appeal

Respondents contend that the trial court erred by concluding that UNC-CH should have paid Petitioner through the BOG's decision on 12 September 2018. In particular, Respondents argue that the trial court's decision is inconsistent with the plain language of *The Code* and state law governing judicial review of administrative agency decisions.[10]

As noted before, we conduct *de novo* review of a trial court's decision that an agency's interpretation of its policies was "affected by other error of law." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 894–95 (2004). Generally, we give "controlling weight" to an agency's own interpretation of its policies, "unless it is plainly erroneous or inconsistent with the [policy]." *Morrell v. Flaherty*, 338 N.C. 230, 237–38, 449 S.E.2d 175, 180 (1994) (quotation and citations omitted). But we will not defer to an interpretation when an "alternative reading is compelled by the [policy's] *plain language.*" *Id.* (emphasis added). Further, "[i]f the

---

[10] Petitioner filed a "Motion to Strike Respondents-Appellants' Brief on Cross-Appeal" on 23 March 2020, arguing that Respondents' brief "grossly violates Rule 28(b)(3) and (5) of the North Carolina Rules of Appellate Procedure and thereby grossly disregards the requirement of a fair presentation of the issues to the appellate court." We deny Petitioner's motion because Respondents' brief includes a sufficient summary of this case's procedural history and relevant facts in accordance with Rule 28(b)(3) and (5).

*only* authority for the agency's interpretation of the law is the decision in that case, that interpretation may be viewed skeptically on judicial review." *Frampton v. Univ. of N.C.*, 241 N.C. App. 401, 411, 773 S.E.2d 526, 533 (2015) (quoting *Rainey v. N.C. Dep't of Pub. Instruction*, 361 N.C. 679, 681–82, 652 S.E.2d 251, 252–53 (2007)).

In its 12 September 2018 decision regarding Petitioner's termination, the BOG found: "The [BOG's] interpretation of its own policy in Section 603(10) is that the final decision concerning discharge from employment at a constituent institution is the decision made by a constituent institution's chancellor." The decision further stated that "[b]ecause Chancellor Folt made a final decision consistent with Section 603(9) with regard to [Petitioner's] discharge from employment on June 9, 2017, [Petitioner] is not entitled to pay beyond June 9, 2017." On judicial review, the trial court disagreed with the BOG and concluded the following:

> 8. Reviewing *de novo* Petitioner's claim that UNC-CH should have continued to pay his salary throughout his administrative appeal through the decision of the BOG, the Court finds that the determination to stop paying Petitioner after the UNC Board of Trustees issued its decision and while Petitioner's appeal was pending before the BOG was not consistent with Section 603(9) and (10) of The Code and, thus, was affected by other error of law. Instead, Petitioner should have been paid through the September 12, 2018 decision of the BOG.

As noted above, *The Code* § 603(9) provides, in relevant part, that:

> If the chancellor concurs in a recommendation of the [Faculty Hearings Committee] that is favorable to the faculty member, the chancellor's decision shall be final. If

the chancellor . . . concurs in a committee recommendation that is unfavorable to the faculty member, the faculty member may appeal the chancellor's decision to the board of trustees. . . . [The decision of the board of trustees] shall be final except that the faculty member may[] . . . file a written notice of appeal[] . . . with the Board of Governors if the faculty member alleges that one or more specified provisions of the Code of the University of North Carolina have been violated.

*The Code* § 603(10) further states:

When a faculty member has been notified of the institution's intention to discharge the faculty member, the chancellor may reassign the individual to other duties or suspend the individual at any time *until a final decision* concerning discharge has been reached by the *procedures* described herein. Suspension shall be exceptional *and with full pay*.

(Emphasis added).

Respondents interpret *The Code* §§ 603(9) and (10) to mean that Chancellor Folt's determination was final, that any other review by the BOT or BOG qualifies as an "appeal," and, therefore, UNC-CH was not obligated to pay Petitioner beyond the decision of Chancellor Folt on 9 June 2017, let alone that of the BOT on 1 August 2017. In our *de novo* review of the plain language of *The Code*, however, the BOG's determination to stop paying Petitioner after the BOT issued its decision and while Petitioner's appeal was pending before the BOG was not consistent with *The Code* §§ 603(9) and (10). *The Code* § 603(9) clearly distinguishes between a "favorable" and "unfavorable" recommendation for a faculty member and uses different language to

describe the finality of each decision. Where there is a "favorable" determination for a faculty member, the chancellor's decision is clearly "final." For a recommendation "unfavorable" to the faculty member, as in this case, *The Code* explicitly provides that a faculty person "may appeal the chancellor's decision to the [BOT]." The decision of the BOT, then, "*shall be final except* that the faculty member may[] . . . file a written notice of appeal[] . . . with the [BOG]." (Emphasis added). Here, *The Code*, as written, carves out a specific exception for the finality of a decision regarding a faculty member's dismissal until review by the BOG.

*The Code* § 603(10) supports this reading of § 603(9). Under § 603(10), once a faculty person has been notified of the "institution's intention to discharge," the chancellor may "reassign" or "suspend" the individual "*until a final decision* concerning discharge has been reached *by the procedures described herein.*" (Emphasis added). The provision provides for "full pay" until that point. The procedures referred to in § 603(10) and outlined, in full, under § 603(9), indicate that the decision regarding Petitioner's employment was not final while the appeal to the BOG was ongoing. Accordingly, Petitioner should have been compensated through the BOG's decision on 12 September 2018.

Beyond an examination of the plain language of *The Code*, Respondents attempt to compare this case to several other cases that distinguish between a "decision" and an "appeal" or in which a chancellor's decision was deemed "final." Yet,

none of those cases interpret the language of *The Code* §§ 603(9) and (10) at issue here. Nor do they consider the continuation of salary of a tenured faculty member through the appeal process of a discharge decision. In addition, Respondents fail to provide any prior examples, except in this case, where the BOG has determined to end payment to a tenured faculty member at the decision of the BOT while an appeal is pending to the BOG.

Based on the foregoing reasons, we conclude that UNC violated its own policies when it ceased Petitioner's pay at the date of the BOT decision before the BOG issued its ultimate decision. Thus, as to Respondents' cross-appeal, we affirm the decision of the trial court.

## IV. Conclusion

For the reasons discussed above, we affirm the trial court.

AFFIRMED.

Judges DIETZ and HAMPSON concur.