IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-561

No. COA20-604

Filed 19 October 2021

Office of Administrative Hearings, No. 19 OSP 04910

ANNETTE LOCKLEAR, Petitioner,

v.

NORTH CAROLINA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Respondent.

Appeal by petitioner from final decision entered 18 May 2020 by Administrative Law Judge Tenisha S. Jacobs in the Office of Administrative Hearings. Heard in the Court of Appeals 25 May 2021.

*Jennifer J. Knox, for petitioner-appellant.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Christopher R. McLennan, for respondent-appellee.*

STROUD, Chief Judge.

¶ 1 Annette Locklear ("Petitioner") appeals from a final decision by an administrative law judge ("ALJ") following a contested case hearing that found the North Carolina Department of Agriculture and Consumer Services ("the Department" or "Respondent") had just cause to dismiss Petitioner from her career state employment for unacceptable personal conduct. Petitioner first argues her actions did not constitute unacceptable personal conduct. Then, Petitioner argues

even if her actions were unacceptable personal conduct, Respondent still did not have just cause to dismiss her. Because after *de novo* review we determine Petitioner engaged in unacceptable personal conduct providing just cause to dismiss her, we affirm.

## I. Background

The uncontested Findings of Fact in this case show Petitioner worked for the Department's[1] Structural Pest Control and Pesticides Division, Structural Pest Control Section, which enforces the Structural Pest Control Act of North Carolina of 1955, North Carolina General Statute § 106-65 (2019), prior to her dismissal for unacceptable personal conduct. At the time of the conduct at issue, John Feagans managed the unit as Petitioner's direct supervisor; Nicky Mitchell was a co-worker of Petitioner with the same duties; and James Burnette, Jr. was the director of the division. Alongside those people, Petitioner's job was to assist with "the licensing and certification of individuals authorized to perform structural pest control" work in the state. As relevant here, Petitioner processed annual license renewal applications using the Agricultural Regulatory System ("the System").[2]

The Findings of Fact describe the importance of the System:

> 17. The accuracy of the information in the AgRSys is critically important given that it is relied upon by

---

[1] In the ALJ's Findings of Fact, the Department is abbreviated "NCDA&CS."

[2] In the ALJ's Findings of Fact, the System is abbreviated "AgRSys."

> NCDA&CS in regulating the structural pest control industry, members of the structural pest control industry that require a license/card in order to work, and members of the public. (TI pp 28-30, 106-06, 232-33; TII pp 307-09)
> 18. In explaining the importance of the AgRSys, Mr. Feagans testified:
>> [W]ith my job as the manager of the licensing system, there is no more important factor than our licensing system is accurate. There are too many people that rely on the information in this licensing system both in our office, out in the field, or the general public. And considering we're licensing people to do something potentially dangerous, as far as applying pesticides, we need to have a resource that we know the qualifications, whether they're legal and -- and in compliance when they make these applications, and any other information.
>>
>> But it has to be reliable. We have to be able to go to this system and trust the information in it . . .
>
> (TI pp 105-06)
> 19. Errors in the AgRSys can reflect negatively on NCDA&CS and hinder the ability of NCDA&CS employees to complete their investigations and determine if violations of the law have occurred. (TI pp 30, 233; TII p 310) Additionally, maintaining inaccurate records that handles public funds (the renewal fees) could subject NCDA&CS to adverse internal/external audit findings. (TI p 109; TII p 310)

(Alteration in original).

¶ 4        Petitioner's conduct at issue in this case related to a specific license renewal application and the related information in the System.  On 11 June 2018, Petitioner received a renewal application from Pest Management Systems, Inc. ("the Company") along with a $2,260 check (Check #41569) to cover the cost of renewal.  When the

Company had not heard about the status of its application by 20 June—well beyond the expected three to four day time period to process a renewal even during the busy renewal season—it called and reached Petitioner's co-worker Mitchell. Mitchell was unable to find the original renewal application, so with the renewal deadline looming, she told the Company to resubmit its application along with a new check and informed her supervisor, Feagans, about her actions, although Mitchell did not communicate with Petitioner. After receiving the application and a new $2,260 check (Check #41656), Mitchell processed the renewals, deposited the new check, and updated the information in the System on 26 June 2018.

¶ 5 Once Mitchell had completed the Company's license renewals, the System would reflect the renewals when anyone looked at it. In order to prevent issues after a renewal had already been processed, the Department also implemented multiple failsafe mechanisms. First, the System would show an error message to anyone attempting to proceed with a duplicate renewal and then prohibit such duplicate renewal. Second, the Department had paper files where an employee could look to determine if renewals had been processed when they received an error message from the System. Third, once renewals had been processed, only the IT Department could change the pertinent information in the System. Petitioner and Mitchell further both knew they were only to contact IT after notifying their supervisor, Feagans, a fact of which Petitioner had been reminded as recently as 11 June 2018. Given these fail

safes:

> [h]ad Petitioner, or anyone else, attempted to process the Pest Management Systems, Inc. renewals after Ms. Mitchell had already done so on 26 June 2018, it would be obvious that these licenses/cards had already been renewed and that depositing an additional check would result in the company being erroneously billed a second time. (Tl pp 209-12, 225-28, 231)

¶ 6   Despite those fail safes, and without notifying her supervisor as required, on 2 July 2018, Petitioner contacted IT to request the check number for the Company's renewal be changed in the System to reflect the check she had originally received, Check #41569. After IT made the requested changes, Petitioner undertook a series of actions that led to the System reflecting false information and the Department overbilling the Company by $2,260:

> 50. Following IT making the changes requested by Petitioner, the AgRSys "ReceiptNumber" listed Check #41569 as having been used to process the 38 license/card renewals for Pest Management Systems, Inc. on 26 June 2018. (Resp. Ex. 7) Additionally, as a result of the changes in the AgRSys requested by Petitioner, there was no record of Check #41656 in the system and anyone attempting to search for that check number would be unable to locate it. (TI p 61)
>
> 51. At the hearing, Petitioner admitted that, following her requested changes, the AgRSys would have shown that Check #41569 was used to issue the Pest Management Systems, Inc. renewals on 26 June 2018 and that she did not issue those licenses/cards on that date. (TII pp 468-69)
>
> 52. The evidence does show, and the Undersigned does find, that following Petitioner's requested changes to the AgRSys, the information reflected in the AgRSys for the

altered records was false.

53. Given the multiple failsafe mechanisms, and the abundance of information available to Petitioner indicating that the renewals for Pest Management Systems, Inc. had already been renewed, the evidence does show, and the Undersigned does find that Petitioner knowingly falsified records in the AgRSys by her 2 July 2018 request for IT to change the Check Number associated with the renewals at issue.

54. After receiving the notification from IT that her requested changes had been made, Petitioner deposited Check #41569 on 3 July 2018 (22 days after it was originally assigned to her for processing). (Resp. Ex. 4 and 8)

55. By depositing Check #41569 on 3 July 2018, Petitioner over-billed Pest Management Systems, Inc. by $2,260.

¶ 7        On 7 August 2018, the Company realized it had been double billed and called Mitchell to report the problem. After Mitchell came to him to ensure the Company received a refund, Feagans began investigating. While Feagans originally believed Mitchell had made a mistake, the next day he learned about Petitioner's request to IT to change the information in the System. Following Petitioner's return from an unrelated leave, Feagans asked Petitioner to explain how the receipt number for the Company's license renewal had been changed in the System. Despite multiple opportunities to do so over the following days,[3] Petitioner never informed Feagans

---

[3] Between Finding of Fact 60 and Finding 61, the listed year of the events changes, without explanation, from 2018 to 2019. Given the record indicates Petitioner returned from leave in October 2018, in accordance with Finding 60 and that Petitioner's dismissal occurred on 2 November 2018, the switch to 2019 appears to be a clerical error. The relevant events described in the Findings all appear to have occurred in 2018.

about her request to IT. In a final meeting with Feagans on 10 October, Petitioner again denied requesting IT change the check number in the System and also denied that Mitchell had performed the renewals, stating instead that Petitioner herself had processed the renewals.

¶ 8        On 2 November 2018, Petitioner was dismissed for unacceptable personal conduct on three grounds:

> 1. Material falsification of a State application or other employment documentation to include falsification of work-related documents (Falsification of records in the . . . System);
> 2. Conduct for which no reasonable person should expect to receive warning (Failure to cooperate with an investigation and manipulating the licensing system in an attempt to falsely implicate a coworker and conceal your own wrongful actions); and
> 3. Conduct unbecoming a State employee that is detrimental to State service (Failure to cooperate with an investigation and manipulating the licensing system in an attempt to falsely implicate a coworker and conceal your own wrongful actions).

Following her dismissal, Petitioner filed an internal grievance, and, following a Step 2 Hearing, her dismissal was upheld on 18 January 2019. Petitioner then filed a petition commencing a contested case in the Office of Administrative Hearings. The ALJ's final decision following a contested case hearing affirmed the Department's decision to dismiss Petitioner based on unacceptable personal conduct. Petitioner appeals.

## II. Analysis

¶ 9 Career state employees receive statutory protections from being, *inter alia*, discharged without "just cause." N.C. Gen. Stat. § 126-35(a) (2019). Just cause includes two potential bases for adverse disciplinary action: (1) action "imposed on the basis of unsatisfactory job performance" or (2) action "imposed on the basis of unacceptable personal conduct." 25 N.C. Admin. Code 1J.0604(b). Petitioner was dismissed for unacceptable personal conduct, so the issues here arise only from that basis.

¶ 10 Focusing on that basis, in *Warren v. North Carolina Dept. of Crime Control & Public Safety, North Carolina Highway Patrol*, this Court established a three-part test for determining whether just cause existed for adverse employment action against career state employees based on unacceptable personal conduct:

> The proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken. Just cause must be determined based "upon an examination of the facts and circumstances of each individual case."

221 N.C. App. 376, 383, 726 S.E.2d 920, 925 (2012) (quoting *North Carolina Dept. of*

*Environment and Natural Resources v. Carroll*, 358 N.C. 649, 669, 599 S.E.2d 888, 900 (2004)).

¶ 11 Here, Petitioner only argues the ALJ's decision erred with respect to *Warren*'s second and third inquiries.[4] Petitioner first argues she prevails under the second inquiry because her actions did not constitute unacceptable personal conduct. Although the argument is not listed as a separate issue presented, Petitioner then raises an issue under the third inquiry when she contends this Court should find no just cause to dismiss her because "something less than dismissal was the proper discipline for her actions." After addressing the standard of review, we will address each of the two contested inquiries in turn.

## A. Standard of Review

¶ 12 As both parties agree, the standard of review for an administrative agency's decision is governed by North Carolina General Statute § 150B-51 (2019), which provides:

> (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the

---

[4] Petitioner also would fail on the first inquiry because she did not challenge any of the ALJ's Findings of Fact on appeal. When Findings of Fact are not challenged, they are binding on appeal. *Smith v. N.C. Department of Public Instruction*, 261 N.C. App. 430, 444, 820 S.E.2d 561, 570–71 (2018) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). Because the Findings are binding on appeal, they establish "that [Petitioner] did, in fact, engage in the conduct described therein. Accordingly, the first prong of the *Warren* test is satisfied . . . ." *Id.*, 261 N.C. App. at 444, 820 S.E.2d at 571.

> findings, inferences, conclusions, or decisions are:
>> (1) In violation of constitutional provisions;
>> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
>> (3) Made upon unlawful procedure;
>> (4) Affected by other error of law;
>> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>> (6) Arbitrary, capricious, or an abuse of discretion.
>
> (c) . . . With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.

¶ 13    As subsection (c) explains, the standard of review depends on the type of case. N.C. Gen. Stat. § 150B-51(c). The differing standards of review can be broken down along the lines of the three inquiries under *Warren* as well. In *Carroll*—the case which *Warren* would later interpret, 221 N.C. App. at 380–83, 726 S.E.2d at 924–25—the Supreme Court explained "[d]etermining whether a public employer had just cause to discipline its employee requires two separate inquiries: first, whether the employee engaged in the conduct the employer alleges, and second, whether that conduct constitutes just cause for [the disciplinary action taken]." *Carroll*, 358 N.C. at 665, 599 S.E.2d at 898 (internal quotations omitted) (second alteration in original). This Court has previously explained that the first *Carroll* inquiry is a question of fact reviewed under the whole record test and that the second *Carroll* inquiry is a question

of law reviewed *de novo*. *Whitehurst v. East Carolina University*, 257 N.C. App. 938, 943–44, 811 S.E.2d 626, 631 (2018). *Warren* determined that *Carroll*'s second inquiry required two separate analyses, which became the second and third *Warren* inquiries. *See Warren*, 221 N.C. App. at 380–83, 726 S.E.2d at 924–25 (explaining the difficulty in reconciling within the second *Carroll* inquiry *Carroll*'s insistence that a court find unacceptable personal conduct and that not all unacceptable personal conduct amounted to just cause before deciding to "balance the equities after the unacceptable personal conduct analysis" as part of three inquiry framework).

¶ 14        Thus, relying on *Whitehurst* provides the following standards of review. *Warren*'s first inquiry mirrors *Carroll*'s first inquiry. *Compare Warren*, 221 N.C. App. at 383, 726 S.E.2d at 925 *with Carroll*, 358 N.C. at 665, 599 S.E.2d at 898. As a result, the first *Warren* inquiry employs the same standard of review as the first *Carroll* inquiry, the whole record test. *See Whitehurst*, 257 N.C. App. at 943, 811 S.E.2d at 631 (explaining first *Carroll* inquiry uses whole record test). Given the second and third *Warren* inquiries both derive from the second *Carroll* inquiry, they employ the same standard of review as the second *Carroll* inquiry, *de novo* review. *See id.*, 257 N.C. App. at 943–44, 811 S.E.2d at 631 (explaining the second *Carroll* inquiry uses *de novo* review).

¶ 15        Here, Petitioner only raises—and only can raise, *see supra* footnote 4—issues under the second and third *Warren* inquiries. As a result, both issues are reviewed

*de novo*. "Under the *de novo* standard of review, the trial court considers the matter anew and freely substitutes its own judgment for the agency's." *Wetherington v. North Carolina Dept. of Public Safety*, 368 N.C. 583, 590, 780 S.E.2d 543, 547 (2015) ("*Wetherington* I") (internal quotations and alterations omitted).

## B. *Warren* Inquiry Two: Unacceptable Personal Conduct

¶ 16 Petitioner first argues "none of [Petitioner's] actions constitute unacceptable personal conduct under the law," which aligns with *Warren*'s second inquiry. *Warren*, 221 N.C. App. at 383, 726 S.E.2d at 925. First, Petitioner contends she could not have falsified records in the System because the term "falsify . . . indicates knowledge of untruth" and there is no evidence Petitioner "had any motive to falsify records" or "even knew that she was entering" inaccurate information. Petitioner then argues she also did not fail to cooperate with the investigation because she "made a mistake and did not intend to falsify the data" such that "it is more logical to conclude that any statements made to her supervisor during the investigation were the result of" a lapse in memory.

¶ 17 Unacceptable personal conduct "is a broad 'catch-all' category that encompasses a wide variety of misconduct by State employees that can result in dismissal without the need for a prior warning." *Smith*, 261 N.C. App. at 444, 820 S.E.2d at 571. As relevant here, unacceptable personal conduct includes:

(a) conduct for which no reasonable person should expect

to receive prior warning;

. . .

(e) conduct unbecoming a state employee that is detrimental to state service;

. . .

(h) falsification of a state application or in other employment documentation.

25 N.C. Admin. Code 1J.0614(8). In the past, this court has clarified conduct unbecoming under subsection (e) does not require a showing of actual harm, "only a potential detrimental impact (whether conduct like the employee's could potentially adversely affect the mission or legitimate interests of the State employer)." *Smith*, 261 N.C. App. at 445, 820 S.E.2d at 571 (internal quotations omitted). Additionally, as the State Human Resources Manual explains, falsification under subsection (h) includes "falsification of work-related documents." State Human Resources Manual § 7, p. 4 (2017).[5]

¶ 18    Here, the ALJ's Findings of Fact are undisputed and therefore binding on appeal. *Smith*, 261 N.C. App. at 444, 820 S.E.2d at 570–71 (citing *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731). The ALJ found that after Petitioner's requested changes were made to the System, the information in the System "was false" because the System would have indicated the check number she used was for work done on 26 June 2018, which Petitioner admitted was not the date she issued a license renewal.

---

[5] Available at: https://oshr.nc.gov/media/1580/open (as of 9 September 2021).

Further, "[g]iven the multiple failsafe mechanisms, and the abundance of information available to Petitioner indicating that the renewals for [the Company] had already been renewed," the ALJ found "Petitioner *knowingly* falsified records" in the System. (Emphasis added) Those two findings alone show Petitioner falsified work related documents, which amounts to unacceptable personal conduct under 25 N.C. Admin. Code 1J.0614(8) and the State Human Resources Manual § 7, p.4.

¶ 19 The same findings also refute Petitioner's argument she did not know she was entering inaccurate information because Petitioner "*knowingly* falsified" the information. (Emphasis added) Further, the System included numerous fail safes to prevent such inadvertent error. The System would provide an error message to anyone trying to proceed with a license renewal that had already been completed, prohibit such duplicate renewal, and indicate in the hard copy file who had renewed the licenses and on what date. Given those fail safes, we agree with the ALJ's binding Finding of Fact that Petitioner knowingly falsified the records. Additionally, the false nature of the information in the System would be apparent to anyone who looked. The System said Petitioner had completed the work on 26 June even though she did not make a request to IT to enable her to perform the work until 2 July. Based on the circumstances, Petitioner knew she was entering false information to the System regardless of her current attempt to claim otherwise.

¶ 20 Petitioner's argument she lacked motive is similarly unconvincing. She cites

no authority indicating motive is a relevant consideration when determining whether she falsified a work-related document. Additionally, even Petitioner's own definition of falsify requires merely knowledge of untruth, not a specific reason for causing the untruth. Thus, using Petitioner's definition, the undisputed facts show Petitioner falsified a work related document.

¶ 21 The falsification basis alone would be enough for Petitioner to fail on the second *Warren* inquiry because "[o]ne act of [unacceptable personal conduct] presents 'just cause' for any discipline, up to and including dismissal." *Hilliard v. North Carolina Dept. of Correction*, 173 N.C. App. 594, 597, 620 S.E.2d 14, 17 (2005). However, the ALJ also concluded Petitioner had committed unacceptable personal conduct on the basis that she engaged in "conduct unbecoming a state employee that is detrimental to state service." 25 N.C. Admin. Code 1J.0614(8)(e). While Petitioner does not clearly state she is challenging this basis, we assume she is because she argues she "had no motive or reason to lie or be uncooperative in the ensuing investigation" and such failure to cooperate was listed as a basis for the conduct unbecoming charge in her original dismissal letter. First, to the extent that this argument is based on her argument that she did not knowingly falsify records, it fails because the uncontested Findings of Fact support that Petitioner knowingly falsified the information in the System. Second, other Findings of Fact layout how Petitioner lied and was uncooperative in the ensuing investigation regardless of whether she had motive to

be.  Petitioner repeatedly failed to inform her supervisor that she had contacted IT to request they change information in the System and also falsely told her supervisor that she, rather than her co-worker Mitchell, had completed the Company's renewals. These undisputed facts indicate Petitioner failed to cooperate in the investigation, supporting the separate conduct unbecoming basis for finding unacceptable personal conduct.

¶ 22        The conduct unbecoming basis also finds strong support in the record based on Petitioner's other actions.  As the uncontested Findings of Fact state, the System's accuracy in general is important because the public uses it to confirm that people applying potentially dangerous pesticides are licensed and because the state uses it to regulate the industry and conduct investigations as necessary.  The System also contains records related to public funds, and, thus, inaccuracies could subject the Department to adverse audit findings.  The inaccuracies Petitioner caused resulted in the Company being temporarily overbilled by $2,260.  Based on those facts, Petitioner's conduct "could potentially adversely affect the mission or legitimate interests of the State employer," as required to conclude an employee committed unbecoming conduct, and, in fact, Petitioner's actions did cause such harm.  *Smith*, 261 N.C. App. at 445, 820 S.E.2d at 571.  Thus, even if Petitioner had not falsified records, as we concluded above, she still committed conduct unbecoming of a state employee and thus engaged in unacceptable personal conduct.  Based on our *de novo*

review, we conclude Petitioner committed unacceptable personal conduct, thereby satisfying the second *Warren* inquiry.

**C. *Warren* Inquiry Three: Just Cause**

¶ 23        Finally, Petitioner contends the ALJ erred in conducting *Warren*'s third inquiry, which requires determining "whether th[e] misconduct amounted to just cause for the disciplinary action taken." *Warren*, 221 N.C. App. at 383, 726 S.E.2d at 925. Petitioner first contends she was never "told the truth" that the application had been reassigned to her coworker Mitchell and argues this "deliberate[] exclu[sion] from important office communications" and then firing her "when she erred in the absence of that information . . . is simply not the *equity and fairness* to the employee required in the just cause context." (Emphasis in original) (internal quotations omitted) Petitioner then separately argues we should reconsider the relevant just cause factors because they "show that something less than dismissal was the proper discipline for [Petitioner's] actions."

¶ 24        When making the just cause determination, the reviewing court must examine "the facts and circumstances of each individual case" because just cause "is a flexible concept, embodying notions of equity and fairness." *Carroll*, 358 N.C. at 669, 599 S.E.2d at 900 (internal quotations omitted). To aid in making that individualized determination during *Warren*'s third inquiry, we look at the factors set forth in *Wetherington I. Whitehurst*, 257 N.C. App. at 945, 811 S.E.2d at 632. Those factors

include: "the severity of the violation, the subject matter involved, the resulting harm, the [employee]'s work history, or discipline imposed in other cases involving similar violations." *Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548. We have recently explained that, in context, the word "or" in the list "must be read as 'and' when applied to the factors which should be considered." *Wetherington v. North Carolina Dept. of Public Safety*, 270 N.C. App. 161, 189–90, 840 S.E.2d 812, 831 (2020) ("*Wetherington II*"). Thus, courts must consider "any factors for which evidence is presented." *Id.*, 270 N.C. App. at 190, 840 S.E.2d at 832.

¶ 25        Petitioner first contends she was not afforded the general "equity and fairness to the employee required in the just cause context" because "she was deliberately excluded from important office communications regarding matters to which she had been assigned, and then fired when she erred in the absence of that information. (Emphasis removed) In support of this argument, Petitioner cites *Whitehurst* for the point that "an employee's conduct must be judged with reference to the facts of which he was aware at the time of his actions."

¶ 26        Petitioner's reliance on *Whitehurst* is misplaced. *Whitehurst* states the cited point in the context of a case where a police officer knew that a person had committed an assault but did not know that the same person had separately been assaulted because no one told him about the second assault, including the victim of the second assault when the officer explicitly asked him what happened. 257 N.C. App. at 947,

811 S.E.2d at 633. In that case, the officer did not have facts held against him in a situation where he took steps to try to ascertain the unknown facts. By contrast, here Petitioner did not act in a way that would have led her to uncover the facts she now complains were withheld from her. Beyond the System's failsafe mechanisms that we have already discussed, the uncontested Findings of Fact detail how Petitioner was supposed to notify her supervisor before requesting IT make changes in the System but failed to take that step. Had Petitioner acted properly and asked her supervisor before contacting IT, her supervisor, who knew that Petitioner's co-worker had inquired about the renewal application before going on to process it herself, would have informed Petitioner that the co-worker had processed the application already. Thus, this case is not similar to *Whitehurst* because here Petitioner did not try to uncover the unknown facts about which she now complains despite Petitioner being told to follow a process that would have uncovered those very facts.

¶ 27        Further, Petitioner still ultimately decided to enter false information into the System as laid out above. Other people failing to inform her of certain facts did not change her own actions. Thus, Petitioner's argument she was not afforded the general equity and fairness underlying just cause does not sway us.

¶ 28        Turning to Petitioner's second argument, we are asked to reweigh the *Wetherington I* factors, which include: "the severity of the violation, the subject matter involved, the resulting harm, the [employee]'s work history, [and] discipline

imposed in other cases involving similar violations." *Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548; *see Wetherington II*, 270 N.C. App. at 189–90, 840 S.E.2d at 831 (explaining the "or" in the original factors list must be read as "and" given the context). We briefly address each factor again relying on the uncontested Findings of Fact.

¶ 29        Taking the first two factors together, the violation is severe precisely because of the subject matter involved. As explained previously, the System relies on accurate information to protect the public from unlicensed people performing potentially dangerous pesticide applications. Petitioner herself even verified the importance of the System having accurate information because she checks the System to verify licensure status. Given the importance of the integrity of the System in protecting the public, Petitioner's violation was severe.

¶ 30        Petitioner's violation was also severe because of the resulting harm. Petitioner's actions led to the Company being double billed and thus overpaying $2,260. While a refund was issued about a month later, the Company still lacked money it should rightfully have had for that month. Further, the Company itself discovered the error and was "not happy" according to Petitioner's co-worker Mitchell, who received their call, which indicates this instance was one of the situations where an error in the System "reflect[ed] negatively" on the Department leading to reputational harm. Thus, while Petitioner contends the ALJ found no harm resulted,

we conclude on *de novo* review that Petitioner's actions caused actual harm both to the overbilled Company and to the Department's reputation.

¶ 31        Examining the fourth factor, Petitioner's work history also favors finding just cause. Petitioner's supervisors described her as "uncooperative, aggressive towards her coworkers, and disrespectful and dismissive" during "the course of her employment." (Internal quotations omitted) They also described her work as "oftentimes unacceptable" and merely "acceptable at best," an assessment borne out by her overall "Does Not Meet Expectations" rating in her 2017-2018 performance review. Further, Petitioner had already received a prior written warning for unacceptable personal conduct and a two-week disciplinary suspension without pay for a violation of the workplace violence policy. Additionally, Petitioner's supervisors had attempted to help improve her performance and workplace conduct for "over a decade" and even reiterated their desire to help her as recently as 30 April 2018, mere months before the conduct that led to Petitioner's dismissal. While Petitioner argues the ALJ only examined the prior two years when reviewing her work history, the uncontested Findings of Fact describe behavior "over the course of [Petitioner's] employment" and convey attempts to help her improve for "over a decade."

¶ 32        The record before us resembles another case where this Court recently found just cause. There, this Court found just cause when the employee's work history included "a pattern of petulant, inappropriate, and insubordinate behavior . . . that

extended over the course of several years" and that did not change "[d]espite repeated attempts" from supervisors to help the employee. *Smith*, 261 N.C. App. at 446–47, 820 S.E.2d at 572. The record here shows a similar pattern with Petitioner's behavior, which also did not improve after her supervisor's repeated attempts to help. Thus, we similarly conclude Petitioner's work history supports finding just cause.

¶ 33 The final *Wetherington I* factor is whether the discipline in this case aligns with discipline in similar cases. 368 N.C. at 592, 780 S.E.2d at 548. Petitioner first highlights "there was no evidence or findings of fact regarding the disciplined [sic] imposed in other cases involving similar violations." While Petitioner is correct, this absence does not impact our overall analysis. The decisionmaker is only required to consider factors "*for which evidence is presented*" such that they cannot rely on one factor while ignoring others. *Wetherington II*, 270 N.C. App. at 190, 840 S.E.2d at 832 (emphasis added). The ALJ here considered all four other *Wetherington I* factors and could not have considered the similar discipline factor because as Petitioner admits, there is no evidence on that factor. Petitioner also repeats her argument that the ALJ failed to take into account that no one was disciplined for not informing her they separately processed the license renewal, but we have already rejected that argument above.

¶ 34 After reviewing each of the *Wetherington I* factors, equity and fairness support the decision to dismiss Petitioner. Thus, after our *de novo* review, we find just cause

to dismiss Petitioner existed.

**D. Findings of Fact Supporting Conclusions of Law**

¶ 35      In addition to the arguments within the *Warren* framework, Petitioner's "Issues Presented" section of the brief also raises as an issue for review whether "the trial court's findings of fact regarding the discipline imposed on Petitioner support its conclusions of law?" (Capitalization altered)  However, at no point in the remainder of the brief does Petitioner discuss this issue or indicate which Conclusions of Law are unsupported by the Findings of Fact.  As a general matter, issues "in support of which no reason or argument is stated[] will be taken as abandoned."  N.C.R. App. P. 28(b)(6); *see also* N.C.R. App. P. 28(a) ("Issues not presented and *discussed* in a party's brief are deemed abandoned.") (emphasis added).  This Court has also previously said that when an appellant listed an additional "Issue Presented" in its brief but "fail[ed] to argue this issue in the text of the brief" the appellant abandoned the challenge. *Capital Resources, LLC v. Chelda, Inc.*, 223 N.C. App. 227, 233 n.4, 735 S.E.2d 203, 208 n.4 (2012).  Here, we similarly conclude Petitioner has abandoned the issue of whether the Findings of Fact support the Conclusions of Law by "failing to argue this issue in the text of the brief." *Id.*

¶ 36      Even if Petitioner had not abandoned the challenge, we still find no error. Many of the potentially contested Conclusions of Law concern the second and third *Warren* inquiries, and we have already reviewed those Conclusions *de novo* and the

Conclusions are supported by the uncontested Findings of Fact. Further, as stated above, we did not review the Conclusions for the first *Warren* inquiry because they simply relied on the uncontested Findings of Fact. *See supra footnote* 4. Thus, even if the issue is not abandoned, the Findings of Fact support the Conclusions of Law based on what we have already explained.

### III.    Conclusion

After *de novo* review of the two contested *Warren* inquires, we find there was just cause to dismiss Petitioner. To the extent Petitioner has not abandoned the issue, the Findings of Fact support the Conclusions of Law. Therefore, we affirm the decision of the ALJ upholding Petitioner's dismissal.

AFFIRMED.

Judges HAMPSON and GRIFFIN concur.